CAPITAL CITIES CABLE, INC., ET AL. *v.* CRISP,
DIRECTOR, OKLAHOMA ALCOHOLIC
BEVERAGE CONTROL BOARD

No. 82–1795.   Argued February 21, 1984—Decided June 18, 1984

*Brent N. Rushforth* argued the cause for petitioners. With him on the briefs for petitioners Cox Cable of Oklahoma City, Inc., et al., were *John D. Matthews, David P. Fleming,* and *J. Christopher Redding.* *Timothy B. Dyk* and *Clyde A. Muchmore* filed briefs for petitioner Capital Cities Cable, Inc.

*Michael W. McConnell* argued the cause *pro hac vice* for the Federal Communications Commission as *amicus curiae* in support of petitioners. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Bator, Richard G. Wilkins, Bruce E. Fein,* and *C. Grey Pash, Jr.*

*Robert L. McDonald,* First Assistant Attorney General of Oklahoma, argued the cause for respondent. With him on the brief were *Michael C. Turpen,* Attorney General, and *James B. Franks* and *Lynn Barnett,* Assistant Attorneys General.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *John G. Koeltl, James C. Goodale, Burt Neu-*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented in this case is whether Oklahoma may require cable television operators in that State to delete all advertisements for alcoholic beverages contained in the out-of-state signals that they retransmit by cable to their subscribers. Petitioners contend that Oklahoma's requirement abridges their rights under the First and Fourteenth Amendments and is pre-empted by federal law. Because we conclude that this state regulation is pre-empted, we reverse the judgment of the Court of Appeals for the Tenth Circuit and do not reach the First Amendment question.

I

Since 1959, it has been lawful to sell and consume alcoholic beverages in Oklahoma. The State Constitution, however, as well as implementing statutes, prohibits the advertising of such beverages, except by means of strictly regulated on-premises signs.[1] For several years, pursuant to this author-

_____

borne, and *Charles S. Sims;* for the National Association of Broadcasters et al. by *Floyd Abrams, Dean Ringel,* and *Susan Buckley;* for the National Cable Television Association, Inc., et al., by *Brenda L. Fox, Robert St. John Roper, Michael S. Schooler, Henry J. Gerken, Ian D. Volner,* and *Mark L. Pelesh;* and for the Turner Broadcasting System, Inc., et al., by *Bruce D. Sokler* and *Peter A. Casciato.*

*Larry Derryberry* filed a brief for S. A. N. E., Inc., as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the State of Mississippi by *Bill Allain,* Attorney General, and *Peter M. Stockett, Jr.,* Special Assistant Attorney General; for the American Advertising Federation et al. by *Eric M. Rubin* and *Walter E. Diercks;* for the American Newspaper Publishers Association et al. by *Marshall J. Nelson, W. Terry Maguire,* and *Pamela J. Riley;* and for the National League of Cities by *Ross D. Davis, David R. Ohlbaum,* and *Henry Geller.*

[1] The Oklahoma Constitution provides in pertinent part:

"It shall be unlawful for any person, firm or corporation to advertise the sale of alcoholic beverage within the State of Oklahoma, except one sign at

ity, Oklahoma has prohibited television broadcasting stations in the State from broadcasting alcoholic beverage commercials as part of their locally produced programming and has required these stations to block out all such advertising carried on national network programming. See *Oklahoma Alcoholic Beverage Control Board* v. *Heublein Wines, Int'l*, 566 P. 2d 1158, 1160 (Okla. 1977).[2] At the same time, the Oklahoma Attorney General has ruled—principally because of the practical difficulties of enforcement—that the ban does not apply to alcoholic beverage advertisements appearing in newspapers, magazines, and other publications printed outside Oklahoma but sold and distributed in the State. Consequently, out-of-state publications may be delivered to Oklahoma subscribers and sold at retail outlets within the State, even though they contain advertisements for alcoholic beverages. Until 1980, Oklahoma applied a similar policy to cable television operators who were permitted to retransmit out-of-state signals containing alcoholic beverage commercials to their subscribers. In March of that year, however, the Oklahoma Attorney General issued an opinion in which he concluded that the retransmission of out-of-state alcoholic beverage commercials by cable television systems operating in the State would be considered a violation of the advertising ban. 11 Op. Okla. Atty. Gen. No. 79–334, p. 550 (Mar. 19,

---

the retail outlet bearing the words 'Retail Alcoholic Liquor Store.'" Art. XXVII, § 5.

The Oklahoma Alcoholic Beverage Control Act similarly prohibits advertising "any alcoholic beverages or the sale of same" except by on-premises signs which must conform to specified size limitations. Okla. Stat., Tit. 37, § 516 (1981).

[2] In upholding this requirement, the Oklahoma Supreme Court specifically noted that it was technically feasible for local television stations to delete alcoholic beverage commercials from the national network programming that they broadcast, because the networks provide sufficient advance notice of such commercials to their Oklahoma affiliates and thereby enable those affiliates to block out those commercials. 566 P. 2d, at 1162.

1980). Respondent Crisp, Director of the Oklahoma Alcoholic Beverage Control Board, thereafter warned Oklahoma cable operators, including petitioners, that they would be criminally prosecuted if they continued to carry such out-of-state advertisements over their systems. App. to Pet. for Cert. 41a; App. 11.[3]

Petitioners, operators of several cable television systems in Oklahoma, filed this suit in March 1981 in the United States District Court for the Western District of Oklahoma, seeking declaratory and injunctive relief. They alleged that the Oklahoma policy violated the Commerce and Supremacy Clauses, the First and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment. Following an evidentiary hearing, the District Court granted petitioners a preliminary injunction and subsequently entered summary judgment and a permanent injunction in December 1981. In granting that relief, the District Court found that petitioners regularly carried out-of-state signals containing wine advertisements, that they were prohibited by federal law from altering or modifying these signals, and that "no feasible way" existed for petitioners to delete the wine advertisements. App. to Pet. for Cert. 40a–41a. Addressing petitioners' First Amendment claim, the District Court applied the test set forth in *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 557 (1980), and concluded that Oklahoma's advertising ban was an unconstitutional restriction on the cable operators' right to engage in protected commercial speech. App. to Pet. for Cert. 47a–50a. On appeal, the Court of Appeals for the

---

[3] Although the Oklahoma statute defines "alcoholic beverage" as "alcohol, spirits, beer, and wine," Okla. Stat., Tit. 37, § 506(2) (1981), the definition of "beer" includes only beverages containing more than 3.2% alcohol by weight, § 506(3). Because beer sometimes contains less than 3.2% alcohol, Oklahoma has determined that beer commercials need not be deleted. At the time this case was brought, hard liquor generally was not advertised on television. Accordingly, enforcement of the advertising ban in this case was limited to requiring that wine commercials be deleted.

Tenth Circuit reversed, holding that, while the wine commercials at issue were protected by the First Amendment, the state ban was a valid restriction on commercial speech. *Oklahoma Telecasters Assn.* v. *Crisp.*, 699 F. 2d 490 (1983).[4] Although the Court of Appeals noted that "Federal Communication[s] Commission regulations and federal copyright law prohibit cable operators from altering or modifying the television signals, including advertisements, they relay to subscribers," the court did not discuss the question whether application of the Oklahoma law to these cable operators was pre-empted by the federal regulations. *Id.*, at 492.

While petitioners' petition for certiorari was pending, a brief was filed for the Federal Communications Commission as *amicus curiae* in which it was contended that the Oklahoma ban on the retransmission of out-of-state signals by cable operators significantly interfered with the existing federal regulatory framework established to promote cable broadcasting. In granting certiorari, therefore, we ordered the parties, in addition to the questions presented by the petitioners concerning commercial speech, to brief and argue the question whether the State's regulation of liquor advertising, as applied to out-of-state broadcast signals, is valid in light of existing federal regulation of cable broadcasting. 464 U. S. 813 (1983).

Although we do not ordinarily consider questions not specifically passed upon by the lower court, see *California* v. *Taylor*, 353 U. S. 553, 557, n. 2 (1957), this rule is not inflexible, particularly in cases coming, as this one does, from the federal courts. See, *e. g.*, *Youakim* v. *Miller*, 425 U. S. 231, 234 (1976) *(per curiam); Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313, 320,

---

[4] The decision of the Court of Appeals similarly disposed of First Amendment claims asserted by local television broadcasters in a case that was consolidated for purposes of appeal with petitioners' case. *Oklahoma Telecasters Assn.* v. *Crisp*, Nos. Civ. 81–290–W and 81–439–W (WD Okla. 1981), rev'd, 699 F. 2d 490 (1983). These television broadcasters, however, did not petition for certiorari.

n. 6 (1971). Here, the conflict between Oklahoma and federal law was plainly raised in petitioners' complaint, it was acknowledged by both the District Court and the Court of Appeals, the District Court made findings on all factual issues necessary to resolve this question, and the parties have briefed and argued the question pursuant to our order. Under these circumstances, we see no reason to refrain from addressing the question whether the Oklahoma ban as applied here so conflicts with the federal regulatory framework that it is pre-empted.

## II

Petitioners and the FCC contend that the federal regulatory scheme for cable television systems administered by the Commission is intended to pre-empt any state regulation of the signals carried by cable system operators. Respondent apparently concedes that enforcement of the Oklahoma statute in this case conflicts with federal law, but argues that because the State's advertising ban was adopted pursuant to the broad powers to regulate the transportation and importation of intoxicating liquor reserved to the States by the Twenty-first Amendment, the statute should prevail notwithstanding the conflict with federal law.[5] As in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), where we held that a California wine-pricing program violated the Sherman Act notwithstanding the State's reliance upon the Twenty-first Amendment in establishing that system, we turn first before assessing the impact of the Twenty-first Amendment to consider whether the Oklahoma statute does in fact conflict with federal law. See *id.*, at 106–114.

Our consideration of that question is guided by familiar and well-established principles. Under the Supremacy Clause, U. S. Const., Art. VI, cl. 2, the enforcement of a state regu-

---

[5] Section 2 of the Twenty-first Amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

lation may be pre-empted by federal law in several circumstances: first, when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law, *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977); second, when it is clear, despite the absence of explicit pre-emptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby "left no room for the States to supplement" federal law, *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947); and, finally, when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See also *Michigan Canners & Freezers Assn.* v. *Agricultural Marketing and Bargaining Board, ante,* at 469.

And, as we made clear in *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141 (1982):

> "Federal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited: 'If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" *Id.,* at 153–154, quoting *United States* v. *Shimer,* 367 U. S. 374, 383 (1961).

The power delegated to the FCC plainly comprises authority to regulate the signals carried by cable television systems. In *United States* v. *Southwestern Cable Co.,* 392 U. S. 157

(1968), the Court found that the Commission had been given "broad responsibilities" to regulate all aspects of interstate communication by wire or radio by virtue of § 2(a) of the Communications Act of 1934, 47 U. S. C. § 152(a), and that this comprehensive authority included power to regulate cable communications systems. 392 U. S., at 177–178. We have since explained that the Commission's authority extends to all regulatory actions "necessary to ensure the achievement of the Commission's statutory responsibilities." *FCC* v. *Midwest Video Corp.*, 440 U. S. 689, 706 (1979). Accord, *United States* v. *Midwest Video Corp.*, 406 U. S. 649, 665–667 (1972) (plurality opinion); *id.*, at 675 (BURGER, C. J., concurring in result). Therefore, if the FCC has resolved to pre-empt an area of cable television regulation and if this determination "represents a reasonable accommodation of conflicting policies" that are within the agency's domain, *United States* v. *Shimer, supra*, at 383, we must conclude that all conflicting state regulations have been precluded.[6]

## A

In contrast to commercial television broadcasters, which transmit video signals to their audience free of charge and derive their income principally from advertising revenues, cable television systems generally operate on the basis of a wholly different entrepreneurial principle. In return for service fees paid by subscribers, cable operators provide their customers with a variety of broadcast and nonbroadcast

---

[6] Relying upon the Court's decision in *FCC* v. *Midwest Video Corp.*, 440 U. S. 689 (1979), respondent contends that the FCC rules and regulations reflecting the agency's intent to pre-empt all state regulation of cable signal carriage violate the First Amendment rights of cable operators by depriving them of editorial control over the signals they carry, and therefore may not be invoked as a basis for pre-emption. We need not consider the merits of this claim, however, since respondent plainly lacks standing to raise a claim concerning his adversaries' constitutional rights in a case in which those adversaries have never advanced such a claim.

signals obtained from several sources. Typically, these sources include over-the-air broadcast signals picked up by a master antenna from local and nearby television broadcasting stations, broadcast signals from distant television stations imported by means of communications satellites, and non-broadcast signals that are not originated by television broadcasting stations, but are instead transmitted specifically for cable systems by satellite or microwave relay. Over the past 20 years, pursuant to its delegated authority under the Communications Act, the FCC has unambiguously expressed its intent to pre-empt any state or local regulation of this entire array of signals carried by cable television systems.

The Commission began its regulation of cable communication in the 1960's. At that time, it was chiefly concerned that unlimited importation of distant broadcast signals into the service areas of local television broadcasting stations might, through competition, "destroy or seriously degrade the service offered by a television broadcaster," and thereby cause a significant reduction in service to households not served by cable systems. *Rules re Microwave-Served CATV*, 38 F. C. C. 683, 700 (1965). In order to contain this potential effect, the Commission promulgated rules requiring cable systems[7] to carry the signals of all local stations in their areas, to avoid duplication of the programs of local television stations carried on the system during the same day that such programs were broadcast by the local stations, and to limit their importation of distant broadcast signals into the

---

[7] In its early efforts to regulate the cable industry, the Commission generally referred to CATV, or "community antenna television," which described systems that receive television broadcast signals, amplify them, retransmit them by cable or microwave, and distribute them by wire to subscribers. But, "[b]ecause of the broader functions to be served by such facilities in the future," the FCC subsequently adopted the "more inclusive term cable television systems." *Cable Television Report and Order*, 36 F. C. C. 2d 143, 144, n. 9 (1972). Congress has also adopted this broader terminology. See Copyright Law Revision, H. R. Rep. No. 94–1476, p. 88 (1976).

service areas of the local television broadcasting stations. *CATV*, 2 F. C. C. 2d 725, 745–746, 781–782 (1966). It was with respect to that initial assertion of jurisdiction over cable signal carriage that we confirmed the FCC's general authority under the Communications Act to regulate cable television systems. *United States* v. *Southwestern Cable Co.*, *supra*, at 172–178.

The Commission further refined and modified these rules governing the carriage of broadcast signals by cable systems in 1972. *Cable Television Report and Order*, 36 F. C. C. 2d 143, on reconsideration, 36 F. C. C. 2d 326 (1972), aff'd *sub nom. American Civil Liberties Union* v. *FCC*, 523 F. 2d 1344 (CA9 1975). In marking the boundaries of its jurisdiction, the FCC determined that, in contrast to its regulatory scheme for television broadcasting stations, it would not adopt a system of direct federal licensing for cable systems. Instead, the Commission announced a program of "deliberately structured dualism" in which state and local authorities were given responsibility for granting franchises to cable operators within their communities and for overseeing such local incidents of cable operations as delineating franchise areas, regulating the construction of cable facilities, and maintaining rights of way. *Cable Television Report and Order*, 36 F. C. C. 2d, at 207. At the same time, the Commission retained exclusive jurisdiction over all operational aspects of cable communication, including signal carriage and technical standards. See *id.*, at 170–176. As the FCC explained in a subsequent order clarifying the scope of its 1972 cable television rules:

> "The fact that this Commission has pre-empted jurisdiction of any and all signal carriage regulation is unquestioned. Nonetheless, occasionally we receive applications for certificates of compliance which enclose franchises that attempt to delineate the signals to be carried by the franchisee cable operator. *Franchising authorities do not have any jurisdiction or authority*

*relating to signal carriage.* While the franchisor might want to include a provision requiring the operator to carry all signals allowable under our rules, that is as far as the franchisor can or should go." *Cable Television,* 46 F. C. C. 2d 175, 178 (1974) (emphasis added).[8]

The Commission has also made clear that its exclusive jurisdiction extends to cable systems' carriage of specialized, nonbroadcast signals—a service commonly described as "pay cable." See *id.,* at 199–200.[9]

---

[8] The Commission has explicitly defined the contours of both its own jurisdictional authority and that of state and local government:

"[W]e have consistently taken the position that to the degree we deem necessary, we will preempt areas of cable regulation in order to assure the orderly development of this new technology into the national communications structure. . . . The subject areas this agency has preempted include, of course, signal carriage, pay cable, leased channel regulations, technical standards, access, and several aspects of franchisee responsibility. . . . Non-federal officials have responsibility for the non-operational aspects of cable franchising including bonding agreements, maintenance of rights-of-way, franchisee selection and conditions of occupancy and construction." *Duplicative and Excessive Over-Regulation—CATV,* 54 F. C. C. 2d 855, 863 (1975).

[9] The Commission explained its initial decision to pre-empt this area as follows:

"After considerable study of the emerging cable industry and its prospects for introducing new and innovative communications services, we have concluded that, at this time, there should be no regulation of rates for such services at all by any governmental level. Attempting to impose rate regulation on specialized services that have not yet developed would not only be premature but would in all likelihood have a chilling effect on the anticipated development." 46 F. C. C. 2d, at 199–200.

More recently, the Commission has noted that it "has deliberately preempted state regulation of non-basic program offerings, both non-broadcast programs and broadcast programs delivered to distant markets by satellite. While the nature of that non-basic offering was (and still is) developing, the preemptive intent, and the reasons for that preemption, are clear and discernible. Today, the degree of diversity in satellite-delivered program services reflects the wisdom of freeing cable systems from burdensome state and local regulation in this area." *Community Cable TV, Inc.,* FCC 83–525, p. 13 (released Nov. 15, 1983).

Although the FCC has recently relaxed its regulation of importation of distant broadcast signals to permit greater access to this source of programming for cable subscribers, it has by no means forsaken its regulatory power in this area. See *CATV Syndicated Program Exclusivity Rules*, 79 F. C. C. 2d 663 (1980), aff'd *sub nom. Malrite T. V. of New York* v. *FCC*, 652 F. 2d 1140 (CA2 1981), cert. denied *sub nom. National Football League* v. *FCC*, 454 U. S. 1143 (1982). Indeed, the Commission's decision to allow unfettered importation of distant broadcast signals rested on its conclusion that "the benefits to existing and potential cable households from permitting the carriage of additional signals are substantial. Millions of households may be afforded not only increased viewing options, but also access to a diversity of services from cable television that presently is unavailable in their communities." 79 F. C. C. 2d, at 746. See also Besen & Crandall, The Deregulation of Cable Television, 44 Law & Contemp. Prob. 77 (Winter 1981). As the Court of Appeals for the Second Circuit observed in upholding this decision, "[by] shifting its policy toward a more favorable regulatory climate for the cable industry, the FCC has chosen a balance of television services that should increase program diversity . . . ." *Malrite T. V. of New York* v. *FCC, supra,* at 1151. Clearly, the full accomplishment of such objectives would be jeopardized if state and local authorities were now permitted to restrict substantially the ability of cable operators to provide these diverse services to their subscribers.

Accordingly, to the extent it has been invoked to control the distant broadcast and nonbroadcast signals imported by cable operators, the Oklahoma advertising ban plainly reaches beyond the regulatory authority reserved to local authorities by the Commission's rules, and trespasses into the exclusive domain of the FCC. To be sure, Oklahoma may, under current Commission rules, regulate such local aspects of cable systems as franchisee selection and construction oversight, see, *e. g., Duplicative and Excessive Over-*

*Regulation—CATV*, 54 F. C. C. 2d 855, 863 (1975), but, by requiring cable television operators to delete commercial advertising contained in signals carried pursuant to federal authority, the State has clearly exceeded that limited jurisdiction and interfered with a regulatory area that the Commission has explicitly pre-empted.[10]

## B

Quite apart from this generalized federal pre-emption of state regulation of cable signal carriage, the Oklahoma advertising ban plainly conflicts with specific federal regulations. These conflicts arise in three principal ways. First, the FCC's so-called "must-carry" rules require certain cable television operators to transmit the broadcast signals of any local television broadcasting station that is located within a specified 35-mile zone of the cable operator or that is "significantly viewed" in the community served by the operator. 47 CFR §§ 76.59(a)(1) and (6) (1983). These "must-carry" rules require many Oklahoma cable operators, including petitioners, to carry signals from broadcast stations located in nearby States such as Missouri and Kansas. See App. 22, 35. In addition, under Commission regulations, the local broadcast signals that cable operators are required to carry must be carried "in full, without deletion or alteration of any portion." 47 CFR § 76.55(b) (1983). Because, in the Commission's view, enforcement of these nondeletion rules serves

---

[10] For that reason our decision in *Head* v. *New Mexico Board of Examiners in Optometry*, 374 U. S. 424 (1963), is not controlling here. In that case, we concluded that a State's authority to ban price-related broadcast advertising for eyeglasses was not pre-empted by the Communications Act, principally because "[n]o specific federal regulations even remotely in conflict with the New Mexico law have been called to our attention. The Commission itself has apparently viewed state regulation of advertising as complementing its regulatory function, rather than in any way conflicting with it." *Id.*, at 432 (footnote omitted). Here, by contrast, the FCC's pre-emptive intent could not be more explicit or unambiguous.

to "prevent a loss of revenues to local broadcasters sufficient to result in reduced service to the public," they have been applied to commercial advertisements as well as to regular programming. *In re Pugh*, 68 F. C. C. 2d 997, 999 (1978); *WAPA–TV Broadcasting Corp.*, 59 F. C. C. 2d 263, 272 (1976); *CATV*, 15 F. C. C. 2d 417, 444 (1968); *CATV*, 2 F. C. C. 2d, at 753, 756. Consequently, those Oklahoma cable operators required by federal law to carry out-of-state broadcast signals in full, including any wine commercials, are subject to criminal prosecution under Oklahoma law as a result of their compliance with federal regulations.

Second, current FCC rulings permit, and indeed encourage, cable television operators to import out-of-state television broadcast signals and retransmit those signals to their subscribers. See *CATV Syndicated Program Exclusivity Rules*, 79 F. C. C. 2d, at 745–746. For Oklahoma cable operators, this source of cable programming includes signals from television broadcasting stations located in Kansas, Missouri, and Texas, as well as the signals from so-called "superstations" in Atlanta and Chicago. App. 21, 35–36. It is undisputed that many of these distant broadcast signals retransmitted by petitioners contain wine commercials that are lawful under federal law and in the States where the programming originates. Nor is it disputed that cable operators who carry such signals are barred by Commission regulations from deleting or altering any portion of those signals, including commercial advertising. 47 CFR § 76.55(b) (1983). Under Oklahoma's advertising ban, however, these cable operators must either delete the wine commercials or face criminal prosecution. Since the Oklahoma law, by requiring deletion of a portion of these out-of-state signals, compels conduct that federal law forbids, the state ban clearly "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal regulatory scheme. *Hines* v. *Davidowitz*, 312 U. S., at 67; *Farmers Union* v. *WDAY, Inc.*, 360 U. S. 525, 535 (1959).

Finally, enforcement of the state advertising ban against Oklahoma cable operators will affect a third source of cable programming over which the Commission has asserted exclusive jurisdiction. Aside from relaying local television broadcasting in accordance with the "must-carry" rules, and distant broadcast signals, cable operators also transmit specialized nonbroadcast cable services to their subscribers. This source of programming, often referred to as "pay cable," includes such advertiser-supported national cable programming as the Cable News Network (CNN) and the Entertainment and Sports Programming Network (ESPN). Although the Commission's "must-carry" and nondeletion rules do not apply to such nonbroadcast cable services, the FCC, as noted earlier, see *supra*, at 703, has explicitly stated that state regulation of these services is completely precluded by federal law.[11]

Petitioners generally receive such signals by antenna, microwave receiver, or satellite dish and restransmit them by wire to their subscribers. But, unlike local television broadcasting stations that transmit only one signal and receive notification from their networks concerning advertisements, cable operators simultaneously receive and channel to their subscribers a variety of signals from many sources without any advance notice about the timing or content of commercial advertisements carried on those signals. Cf. n. 2, *supra*. As the record of this case indicates, developing the capacity to monitor each signal and delete every wine commercial before it is retransmitted would be a prohibitively burdensome task. App. 25–26, 36–38. Indeed, the District Court specifically found that, in view of these considerations, "[t]here exists no feasible way for [cable operators] to block out the

---

[11] See *Community Cable TV, Inc.*, FCC 83–525, pp. 11–14 (released Nov. 15, 1983); *Duplicative and Excessive Over-Regulation—CATV*, 54 F. C. C. 2d, at 861–863; *Cable Television*, 46 F. C. C. 2d, at 199–200; *Time-Life Broadcast, Inc.*, 31 F. C. C. 2d 747 (1971); *Federal Preemption of CATV Regulations*, 20 F. C. C. 2d 741 (1969).

[wine] advertisements." App. to Pet. for Cert. 41a.[12] Accordingly, if the state advertising ban is enforced, Oklahoma cable operators will be compelled either to abandon altogether their carriage of both distant broadcast signals and specialized nonbroadcast cable services or run the risk of criminal prosecution. As a consequence, the public may well be deprived of the wide variety of programming options that cable systems make possible.

Such a result is wholly at odds with the regulatory goals contemplated by the FCC. Consistent with its congressionally defined charter to "make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide and world-wide wire and radio communication service . . .," 47 U. S. C. § 151, the FCC has sought to ensure that "the benefits of cable communications become a reality on a nationwide basis." *Duplicative and Excessive Over-Regulation—CATV*, 54 F. C. C. 2d, at 865. With that end in mind, the Commission has determined that only federal preemption of state and local regulation can assure cable systems the breathing space necessary to expand vigorously and provide a diverse range of program offerings to potential cable subscribers in all parts of the country. While that judgment may not enjoy universal support, it plainly represents a reasonable accommodation of the competing policies committed to the FCC's care, and we see no reason to disturb the agency's judgment. And, as we have repeatedly explained, when federal officials determine, as the FCC has here, that restrictive regulation of a particular area is not in the public interest, "States are not permitted to use their police power to enact such a regulation." *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 178 (1978); *Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U. S. 767, 774

---

[12] At one time, the FCC itself considered a proposal to permit cable systems to substitute commercial advertisements on distant signals, but concluded that such a plan was not feasible. *Cable Television Report and Order*, 36 F. C. C. 2d, at 165.

(1947). Cf. *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S., at 155 (Federal Home Loan Bank Board explicitly pre-empted state due-on-sale clauses in order to afford flexibility and discretion to federal savings and loan institutions).

C

Although the FCC has taken the lead in formulating communications policy with respect to cable television, Congress has considered the impact of this new technology, and has, through the Copyright Revision Act of 1976, 90 Stat. 2541, 17 U. S. C. § 101 *et seq.*, acted to facilitate the cable industry's ability to distribute broadcast programming on a national basis. Prior to the 1976 revision, the Court had determined that the retransmission of distant broadcast signals by cable systems did not subject cable operators to copyright infringement liability because such retransmissions were not "performances" within the meaning of the 1909 Copyright Act. *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 415 U. S. 394 (1974); *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S. 390 (1968). In revising the Copyright Act, however, Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement. At the same time, Congress recognized that "it would be impractical and unduly burdensome to require every cable system to negotiate [appropriate royalty payments] with every copyright owner" in order to secure consent for such retransmissions. Copyright Law Revision, H. R. Rep. No. 94–1476, p. 89 (1976).[13] Sec-

---

[13] In developing this approach, Congress was aware that cable operators would face virtually insurmountable technical and logistical problems if they were required to block out all programs as to which they had not directly obtained copyright permission from the owner. See, *e. g.*, Copyright Law Revision, Hearings on H. R. 2223 before the Subcommittee on Courts, Civil Liberties and the Administration of Justice of the House Committee on the Judiciary, 94th Cong., 1st Sess., pt. 2, p. 758 (1975);

tion 111 of the 1976 Act codifies the solution devised by Congress. It establishes a program of compulsory copyright licensing that permits cable systems to retransmit distant broadcast signals without securing permission from the copyright owner and, in turn, requires each system to pay royalty fees to a central royalty fund based on a percentage of its gross revenues.[14] To take advantage of this compulsory licensing scheme, a cable operator must satisfy certain reporting requirements, §§ 111(d)(1) and (2)(A), pay specified royalty fees to a central fund administered by the Register of Copyrights, §§ 111(d)(2)(B)–(D) and (3), and refrain from deleting or altering commercial advertising on the broadcast signals it transmits, § 111(c)(3). Failure to comply with these conditions results in forfeiture of the protections of the compulsory licensing system.

In devising this system, Congress has clearly sought to further the important public purposes framed in the Copyright Clause, U. S. Const., Art. I, § 8, cl. 8, of rewarding the creators of copyrighted works and of "promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 156 (1975) (footnote omitted); *Sony Corp.* v. *Universal City Studios, Inc.*, 464 U. S. 417, 428–429 (1984). Compulsory licensing not only protects the commercial value of copyrighted

---

Copyright Law Revision: Hearings on S. 1361 before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., 291–292, 400–401 (1973).

[14] The keystone of this system, § 111(c)(1), provides:

"Subject to the provisions of clauses (2), (3), and (4) of this subsection, secondary transmissions to the public by a cable system of a primary transmission made by a broadcast station licensed by the Federal Communications Commission . . . and embodying a performance or display of a work shall be subject to compulsory licensing upon compliance with the requirements of subsection (d) where the carriage of the signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission." 17 U. S. C. § 111(c)(1).

works but also enhances the ability of cable systems to re-transmit such programs carried on distant broadcast signals, thereby allowing the public to benefit by the wider dissemination of works carried on television broadcast signals.[15] By requiring cable operators to delete commercial advertisements for wine, however, the Oklahoma ban forces these operators to lose the protections of compulsory licensing. Of course, it is possible for cable systems to comply with the Oklahoma ban by simply abandoning their importation of the distant broadcast signals covered by the Copyright Act. But such a loss of viewing options would plainly thwart the policy identified by both Congress and the FCC of facilitating and encouraging the importation of distant broadcast signals.

## III

Respondent contends that even if the Oklahoma advertising ban is invalid under normal pre-emption analysis, the fact that the ban was adopted pursuant to the Twenty-first

---

[15] As the House Committee Report explained:

"In general, the Committee believes that cable systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and that copyright royalties should be paid by cable operators to the creators of such programs. The Committee recognizes, however, that it would be impractical and unduly burdensome to require every cable system to negotiate with every copyright owner whose work was retransmitted by a cable system. Accordingly, the Committee has determined to maintain the basic principle of the Senate bill to establish a compulsory copyright license for the retransmission of those over-the-air broadcast signals that a cable system is authorized to carry pursuant to the rules and regulations of the FCC." H. R. Rep. No. 94-1476, p. 89 (1976).

See also H. R. Conf. Rep. No. 94-1733, pp. 75-76 (1976); 122 Cong. Rec. 31979 (1976) (remarks of Rep. Kastenmeier); id., at 31984 (remarks of Rep. Railsback); id., at 32009 (remarks of Rep. Danielson); Eastern Microwave, Inc. v. Doubleday Sports, Inc., 691 F. 2d 125, 132-133 (CA2 1982) (discussing Congress' decision to establish "a compulsory licensing program to insure that [cable systems] could continue bringing a diversity of broadcasted signals to their subscribers").

Amendment rescues the statute from pre-emption. A similar claim was advanced in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc,* 445 U. S. 97 (1980). In that case, after finding that a California wine-pricing program violated the Sherman Act, we considered whether § 2 of the Twenty-first Amendment, which reserves to the States certain power to regulate traffic in liquor, "permits California to countermand the congressional policy—adopted under the commerce power—in favor of competition." 445 U. S., at 106. Here, we must likewise consider whether § 2 permits Oklahoma to override the federal policy, as expressed in FCC rulings and regulations, in favor of promoting the widespread development of cable communication.

The States enjoy broad power under § 2 of the Twenty-first Amendment to regulate the importation and use of intoxicating liquor within their borders. *Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132 (1939). At the same time, our prior cases have made clear that the Amendment does not license the States to ignore their obligations under other provisions of the Constitution. See, *e. g., Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116, 122, n. 5 (1982); *California* v. *LaRue,* 409 U. S. 109, 115 (1972); *Wisconsin* v. *Constantineau,* 400 U. S. 433, 436 (1971); *Department of Revenue* v. *James B. Beam Distilling Co.,* 377 U. S. 341, 345–346 (1964). Indeed, "[t]his Court's decisions . . . have confirmed that the Amendment primarily created an exception to the normal operation of the Commerce Clause." *Craig* v. *Boren,* 429 U. S. 190, 206 (1976). Thus, as the Court explained in *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.,* 377 U. S. 324 (1964), § 2 reserves to the States power to impose burdens on interstate commerce in intoxicating liquor that, absent the Amendment, would clearly be invalid under the Commerce Clause. *Id.,* at 330; *State Board of Equalization* v. *Young's Market Co.,* 299 U. S. 59, 62–63 (1936). We have cautioned, however, that "[t]o draw a conclusion . . . that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce

Clause wherever regulation of intoxicating liquors is concerned would . . . be an absurd oversimplification." *Hostetter, supra,* at 331–332. Notwithstanding the Amendment's broad grant of power to the States, therefore, the Federal Government plainly retains authority under the Commerce Clause to regulate even interstate commerce in liquor. *Ibid.* See also *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc., supra,* at 109–110; *Nippert* v. *Richmond,* 327 U. S. 416, 425, n. 15 (1946); *United States* v. *Frankfort Distilleries, Inc.,* 324 U. S. 293 (1945).

In rejecting the claim that the Twenty-first Amendment ousted the Federal Government of all jurisdiction over interstate traffic in liquor, we have held that when a State has not attempted directly to regulate the sale or use of liquor within its borders—the core § 2 power—a conflicting exercise of federal authority may prevail. In *Hostetter,* for example, the Court found that in-state sales of intoxicating liquor intended to be used only in foreign countries could be made under the supervision of the Federal Bureau of Customs, despite contrary state law, because the state regulation was not aimed at preventing unlawful use of alcoholic beverages within the State, but rather was designed "totally to prevent transactions carried on under the aegis of a law passed by Congress in the exercise of its explicit power under the Constitution to regulate commerce with foreign nations." 377 U. S., at 333–334. Similarly, in *Midcal Aluminum, supra,* we found that "the Twenty-first Amendment provides no shelter for the violation of the Sherman Act caused by the State's wine pricing program," because the State's interest in promoting temperance through the program was not substantial and was therefore clearly outweighed by the important federal objectives of the Sherman Act. 445 U. S., at 113–114.

Of course, our decisions in *Hostetter* and *Midcal Aluminum* were concerned only with conflicting state and federal efforts to regulate transactions involving liquor. In this case, by contrast, we must resolve a clash between an ex-

press federal decision to pre-empt all state regulation of cable signal carriage and a state effort to apply its ban on alcoholic beverage advertisements to wine commercials contained in out-of-state signals carried by cable systems. Nonetheless, the central question presented in those cases is essentially the same as the one before us here: whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies. As in *Hostetter* and *Midcal Aluminum*, resolution of this question requires a "pragmatic effort to harmonize state and federal powers" within the context of the issues and interests at stake in each case. 445 U. S., at 109.

There can be little doubt that the comprehensive regulations developed over the past 20 years by the FCC to govern signal carriage by cable television systems reflect an important and substantial federal interest. In crafting this regulatory scheme, the Commission has attempted to strike a balance between protecting noncable households from loss of regular television broadcasting service due to competition from cable systems and ensuring that the substantial benefits provided by cable of increased and diversified programming are secured for the maximum number of viewers. See, *e. g.*, *CATV Syndicated Program Exclusivity Rules*, 79 F. C. C. 2d, at 744–746. To accomplish this regulatory goal, the Commission has deemed it necessary to assert exclusive jurisdiction over signal carriage by cable systems. In the Commission's view, uniform national communications policy with respect to cable systems would be undermined if state and local governments were permitted to regulate in piecemeal fashion the signals carried by cable operators pursuant to federal authority. See *Community Cable TV, Inc.*, FCC 83–525, pp. 12–13 (released Nov. 15, 1983); *Cable Television*, 46 F. C. C. 2d, at 178.

On the other hand, application of Oklahoma's advertising ban to out-of-state signals carried by cable operators in that

State is designed principally to further the State's interest in discouraging consumption of intoxicating liquor. See 11 Op. Okla. Atty. Gen. No. 79–334, p. 550 (Mar. 19, 1980). Although the District Court found that "[c]onsumption of alcoholic beverages in Oklahoma has increased substantially in the last 20 years despite the ban on advertising of such beverages," App. to Pet. for Cert. 42a, we may nevertheless accept Oklahoma's judgment that restrictions on liquor advertising represent at least a reasonable, albeit limited, means of furthering the goal of promoting temperance in the State. The modest nature of Oklahoma's interests may be further illustrated by noting that Oklahoma has chosen not to press its campaign against alcoholic beverage advertising on all fronts. For example, the State permits both print and broadcast commercials for beer, as well as advertisements for all alcoholic beverages contained in newspapers, magazines, and other publications printed outside of the State. The ban at issue in this case is directed only at wine commercials that occasionally appear on out-of-state signals carried by cable operators. By their own terms, therefore, the State's regulatory aims in this area are narrow. Although a state regulatory scheme obviously need not amount to a comprehensive attack on the problems of alcohol consumption in order to constitute a valid exercise of state power under the Twenty-first Amendment, the selective approach Oklahoma has taken toward liquor advertising suggests limits on the substantiality of the interests it asserts here. In contrast to state regulations governing the conditions under which liquor may be imported or sold within the State, therefore, the application of Oklahoma's advertising ban to the importation of distant signals by cable television operators engages only indirectly the central power reserved by § 2 of the Twenty-first Amendment—that of exercising "control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *Midcal Aluminum*, 445 U. S., at 110.

When this limited interest is measured against the significant interference with the federal objective of ensuring wide-

spread availability of diverse cable services throughout the United States—an objective that will unquestionably be frustrated by strict enforcement of the Oklahoma statute—it is clear that the State's interest is not of the same stature as the goals identified in the FCC's rulings and regulations. As in *Midcal Aluminum*, therefore, we hold that when, as here, a state regulation squarely conflicts with the accomplishment and execution of the full purposes of federal law, and the State's central power under the Twenty-first Amendment of regulating the times, places, and manner under which liquor may be imported and sold is not directly implicated, the balance between state and federal power tips decisively in favor of the federal law, and enforcement of the state statute is barred by the Supremacy Clause.[16]

## IV

We conclude that the application of Oklahoma's alcoholic beverage advertising ban to out-of-state signals carried by cable operators in that State is pre-empted by federal law and that the Twenty-first Amendment does not save the regulation from pre-emption. The judgment of the Court of Appeals is

*Reversed.*

---

[16] Because we have resolved the pre-emption and Twenty-first Amendment issues in petitioners' favor, we need not consider the additional question whether Oklahoma's advertising ban constitutes an invalid restriction on protected commercial speech, and we therefore express no view on that issue.