Elsie Viola MILLER and Oretta Bernice Lancaster, doing business as the Junction Cafe and Tavern; Taylor's Coffee Shop, Inc., d/b/a Rennie's Landing; and Wian, Inc., d/b/a Barney's Cable, Plaintiffs,

v.

William H. HEDLUND; Sylvia S. Bedingfield; Reuben A. Worster; Stan Auderkirk; and Jill Thorne, individually in their representative capacities as the Commissioners of the Oregon Liquor Control Commission; C. Dean Smith, individually in his capacity as Administrator for the Oregon Liquor Control Commission; Spear Beverage Co., Inc.; and Coast Distributors, Inc., Defendants.

Civ. No. 78–259 FR.

United States District Court,
D. Oregon.

July 19, 1989.

---

David W. Axelrod, Schwabe, Williamson & Wyatt, Portland, Or., for plaintiffs.

Dave Frohnmayer, Atty. Gen., Arden J. Olson, Glenn Klein, Asst. Attys. Gen., Sp. Litigation Unit, Dept. of Justice, Salem, Or., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRYE, Judge:

The issue before the court is whether the Twenty–First Amendment to the United States Constitution permits the Oregon Liquor Control Commission (OLCC) to promulgate and enforce certain rules which are anti-competitive in nature. These anti-competitive rules 1) require competing beer and wine wholesalers to publicly post and thereby to exchange prices not less than ten days in advance of the effective date of the prices; 2) require any decrease in the price of beer and wine to be maintained for not less than ninety days and thirty days, respectively; and 3) require all beer and wine wholesalers to charge beer and wine retailers a single uniform delivered price for each package of beer and wine sold.

## FINDINGS OF FACT

### Price Discrimination

The OLCC asserts that the rules at issue are necessary, despite their anti-competitive nature, in order for it to regulate the sale and distribution of beer and wine pursuant to its privilege and duty under the Twenty–First Amendment to the United States Constitution. These laws are aimed at preventing *de facto* combinations between beer and wine wholesalers and the largest chain store retailers, such as Safeway, Albertson, and Fred Meyer, and the resulting price discrimination. These laws include 1) O.R.S. 471.465, which prohibits a beer and wine wholesaler from granting discounts, rebates or gratuities to any beer and wine retailer; and 2) O.R.S. 471.455 and 471.456, which prohibits a beer and wine wholesaler from owning an interest in any beer and/or wine retail establishment if the ownership interest involves the beer and wine wholesaler in the day-to-day management operations of the retail establishment or is used to exclude the brands of beer and wine sold by competing wholesalers.

Price discrimination by beer and wine wholesalers also violates Oregon's Anti–Price Discrimination Act, O.R.S. 646.010 *et seq.;* the Robinson–Patman Price Discrimination Act, 15 U.S.C. §§ 13(a) and 13(f); the Federal Trade Commission Act, 15 U.S.C. § 45 and implementing regulations; stringent federal alcoholic beverage regulations prohibiting price discrimination, 27 C.F.R. §§ 10.1 *et seq.;* the prohibition against tied houses, 27 C.F.R. §§ 6.1 *et seq.;* and the common law. Price discrimination is unlawful both for the wholesaler who discriminates and the retailer who benefits from the discrimination.

Because price discrimination carries significant state, federal and commercial penalties and involves two parties, a wholesaler who discriminates is not likely to record the price charged a favored retailer. Price discrimination can take a number of forms and is difficult to prove without the cooperation of either the wholesaler or the retailer. Price discrimination on the part of wholesalers may include cash payments to favored retailers, the delivery of more product to favored retailers than is reflected on invoices, and credits given to favored retailers for bottles which were never returned.

In order to enforce laws against price discrimination, it is necessary 1) to identify discriminatory sales, 2) to identify the prices paid by non-favored retailers to wholesalers, and 3) to prove the prices paid by favored retailers to wholesalers. In deciding the merits of this case, it is the relationship between the challenged features of the OLCC regulations and these three components that must be considered.

### The Identification and Policing of Discriminatory Sales

Wholesalers of beer and wine are able to identify accurately, quickly, and reliably the market prices of competing wholesalers shortly after the prices of competing

wholesalers become effective as a part of their ordinary sales and delivery practices. This is possible because retailers customarily price beer and wine at consistent markups over their costs for the beer and wine. Wholesalers are knowledgeable about the margin practices of their retail customers. Wholesalers can determine from the shelf prices of beer and wine the costs of purchase of the beer and wine to the retailers. Deviation from the usual costs of purchase indicates either a change in wholesale prices or a retailer's decision to change margin practices. Wholesalers instruct their sales staff to review on a regular basis the retail prices of all brands of beer and wine during the course of their work.

Price discrimination by wholesalers can also be identified in the marketplace by competing wholesalers by the unusual behavior of retailers, such as unusually low prices for product, changes in the shelf positions of product, or unusual advertising. In other words, visible market behavior alerts wholesalers to the possibility of price discrimination by competing wholesalers.

Wholesalers police suspected price discrimination by other wholesalers through a system of professional courtesy. They do this for two reasons: first, the penalty of the loss of a wholesaler's license and therefore the loss of substantial capital investment is a severe penalty; and second, price discrimination, when it occurs, is more likely to be committed by overzealous, commission-paid salespersons than by the design of management. If a wholesaler suspects a competing wholesaler of price discrimination, the suspecting wholesaler will notify the management of the competing wholesaler in order to enable the competing wholesaler to police its employees or to desist from its practices.

Every wholesaler who testified before this court stated that this private system of monitoring works well to prevent price discrimination. The enforcement chief of the OLCC testified that since 1970, he had received an average of 1.1 "complaints" per year of suspected violations of the Price Posting Rule. OLCC witnesses did not identify a single case in which the Price Posting Rule played any role in identifying or prosecuting wholesalers or retailers who practiced price discrimination.

### Delivery Practices

Beer and wine wholesalers deliver beer and wine to over ninety percent of their beer and wine retail customers more than once a week. Virtually all beer and wine retailers receive deliveries more frequently than once every fourteen days. Each retailer has the opportunity to purchase beer and wine in proportion to the retailer's customary purchasing practices. Exceptions to these delivery practices occur only in remote, rural areas or where delivery is made at the specific request of the retailer rather than on a regular schedule. With advance notice to the wholesaler, however, all retailers have an opportunity to purchase beer and wine during any fourteen-day price promotion.

A wholesaler generally delivers beer and wine to retailers in metropolitan areas adjacent to the wholesaler's establishment. A wholesaler delivers beer and wine to retailers in outlying areas at significant transportation expense to the wholesaler. Nonetheless, beer and wine wholesalers are required to charge beer and wine retailers in remote areas such as Mt. Hood and Detroit Dam the same price for beer and wine that they charge retailers located next door to the wholesalers.

### The Actual Use and Anticompetitive Effect of the Challenged Features of the Price Posting Rule

(a) The Price Posting Process

Wholesalers post prices with the OLCC in Portland, Oregon. There is no limit to the number or frequency of prices which can be posted with the OLCC by wholesalers. Wholesalers are permitted to file, retract and resubmit prices for posting months in advance of the effective dates of these prices.

The OLCC maintains a room where wholesalers can review each others' posted prices. OLCC staff reviews the prices posted with the OLCC to insure that the

prices charged by wholesalers to their retailers are no higher than the prices they posted with the OLCC, and that the prices charged by wholesalers to retailers were posted at the OLCC at least ten days before the sales to the retailers were made. With rare exceptions, only beer and wine wholesalers review the prices which are posted at the OLCC. Beer and wine wholesalers regularly go to the OLCC office to review the prices posted by their competitors.

### (b) Use by the OLCC Staff

Price posting at the offices of the OLCC is administered by the supervisor of beer and wine, the person most knowledgeable with respect to the use that is made of posted prices. In 1978, the supervisor of beer and wine, Nada Lohmeier, stated in formal administrative hearings that there was no reason related to the OLCC's enforcement responsibilities for price postings to be made public; that the thirty and (then) 180–day price posting periods were not needed in order for the staff of the OLCC to perform any of its responsibilities; and that the only use that was made of price postings by the staff of the OLCC was to aid in computation of the privilege tax to be paid by beer and wine wholesalers.

In 1982, Al Bianconi, Lohmeier's successor, and Dean Smith, the Administrator of the OLCC, testified in formal administrative hearings that there was no reason related to the OLCC's achievement of its statutory responsibilities for the prices posted by wholesalers to be made public; that the only reason for price posting periods was to insure that beer and wine retailers had an opportunity to purchase beer and wine during pricing promotions; that the ninety-day price posting period was the arbitrary result of political negotiation; and that administrative simplicity was the only rationale for requiring beer and wine wholesalers to charge the same delivered price to every retailer of beer and wine in the State of Oregon.

In 1988, the OLCC staff, including James Miller, the current supervisor of beer and wine, concluded that there would be no adverse effect on the performance of the enforcement responsibilities of the OLCC if the Commissioners eliminated the public, advance posting of the prices of competing wholesalers of beer and wine and reduced the ninety-day price posting period for beer to thirty days.

To summarize, price posting does not provide the OLCC with enforcement information which it could not readily obtain without price posting. The public exchange feature of price posting has never led to the identification of one instance of price discrimination.

### (c) Use by Competing Wholesalers to Fix Prices

The public, advance posting of beer and wine prices by wholesalers facilitates, and has been used by, beer and wine wholesalers to permit them to agree upon and stabilize the wholesale prices of beer and wine before they offer them to retailers. All beer and wine wholesalers know that any price reduction or competitive price that they intend to offer to retailers will be communicated in advance of its effective date to competitors through price posting. All beer and wine wholesalers are aware of this pricing structure and of their interdependence upon each other. Wholesale prices are therefore stabilized at higher levels than they might be in a truly competitive situation.

The testimony of Chris Maletis illustrates the use by wholesalers of the price posting system to "fix" prices. Maletis testified that in 1986, Columbia Distributing, his wholesale business and one of the largest beer and wine wholesalers in the State of Oregon, used the price posting exchange at the OLCC as a starting point for communicating with competing wholesalers of keg beer until agreement was reached by all wholesalers of keg beer on a new wholesale price for keg beer. Columbia Distributing operates on a thirty percent margin. Maletis attempted to transform a $1.00 increase in the brewery prices paid by Maletis on the wholesale level into a $5.00 retail price increase, an eighty per-

cent profit margin for Columbia Distributing. Competing wholesalers, planning months in advance, "telegraphed" their agreement or disagreement through their price posting at the OLCC. Ultimately, the largest Portland wholesalers agreed to a $3.00 increase in the wholesale price of keg beer.

### (d) The Impact of Lengthy Price Posting Periods

The cost of promotional price programs for beer and wine wholesalers is dependent upon the duration of the promotional price programs and on how much the price of beer and wine is discounted. The benefits which wholesalers seek from promotional price programs are increased sales, advantageous shelf positions for their products, and consumer awareness of their products. In order for beer and wine wholesalers to benefit from promotional price programs, beer and wine retailers must cooperate and participate in the promotional price programs.

Any price posting period for beer and wine that is longer than that minimally necessary to insure that beer and wine retailers have an opportunity to purchase beer and wine at the prices posted by wholesalers deters price competition. In addition, price posting increases costs to beer and wine wholesalers who engage in competitive pricing. Furthermore, price posting makes it increasingly likely that beer and wine retailers will only participate in part of the promotional price programs offered by wholesalers. In summary, the cost and inefficiency of price posting stifles price competition.

### (e) Uniform, Delivered Pricing

The cost of transportation is a significant and identifiable cost of doing business. The effect of requiring a uniform cost for transporting beer and wine to retailers is to prohibit the marketplace from developing greater efficiency in distribution, to subsidize rural retailers at the expense of urban retailers, and, most importantly, to facilitate price fixing.

### Administrative Concerns of the OLCC Staff

At the supplemental hearing, staff members from the OLCC testified that the anticompetitive features of price posting were necessary to simplify and reduce their workload. These administrative concerns are not related to Twenty–First Amendment interests. More importantly, there is no evidence that these administrative concerns could not be met by rules which do not result in price-fixing.

### APPLICABLE LAW

The challenged features of the rules and regulations of the OLCC constitute a "substantial impairment of the strong federal interest in favor of competition." *Miller v. Hedlund*, 813 F.2d 1344, 1352 (9th Cir. 1987). This court must determine " 'whether the interests implicated by [the] state regulation[s] are so closely related to the powers reserved by the Twenty-first Amendment that the regulation[s] may prevail, notwithstanding that [their] requirements directly conflict with express federal policies.' " *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 275–76, 104 S.Ct. 3049, 3057, 82 L.Ed.2d 200 (1984), quoting *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). In order to resolve this issue, the court must compare the competing federal and state interests "after careful scrutiny of those concerns in a 'concrete case.' " *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110, 100 S.Ct. 937, 946, 63 L.Ed.2d 233 (1980).

### CONCLUSIONS OF LAW

#### The Ten–Day Advance Exchange of Wholesale Prices

There is no material relationship between the advance exchange of wholesale prices through price posting at the offices of the OLCC and the three components related to prohibiting financial assistance to retailers by wholesalers, which are (a) identifying a suspected discriminatory sale, (b) identifying the non-discriminatory market price,

and (c) proving that there was a favored price.

Suspected price discrimination is identified by objective, "highly visible," market behavior. Wholesalers and their sales personnel can readily determine the current, effective prices of competitors by "backing out" from retail shelf prices the retailers' known, customary margins. Price posting is not necessary for wholesalers to determine their competitors' prices.

A discriminatory sale cannot take place until *after* prices are effective and appear in the marketplace. Price posting is unrelated to this interest.

Advance public posting of wholesale prices leads to horizontal price fixing, thereby adversely impacting retailers and, ultimately, the consumers. The ten-day price posting requirement does not significantly aid in the identification and enforcement of the ban on financial assistance. The administrative goals of the OLCC, i.e. to have a record of the correct prices of wholesalers for possible enforcement action—and to psychologically deter price fixing—can be achieved by means other than authorizing, facilitating, and inducing horizontal price fixing.

### The Post–Off Restraint

The anticompetitive effect of price posting is to reduce the number of competitive price promotions, and thereby the number of times a wholesaler could, hypothetically, discriminate in information about those programs. However, no evidence was presented that discrimination in information has ever occurred or was the object of the post-off restraint. All wholesalers and all retailers testified, with one exception, that a fourteen-day post-off period would insure proportional opportunity to all retailers. The lone exception, Bachelor Beverage, indicated that three percent of its accounts consisting of the smallest, most remote customers would require a greater window of opportunity. That window of opportunity is already available through advance notice provided by Bachelor Beverage, by the retailers' ability to pick up product, and the wholesalers' ability to deliver product ten days after the purchase period.

The Commissioners of the OLCC could tailor specific regulations to insure to rural retailers a reasonable opportunity to participate in any promotional program. The post-off provisions penalize legitimate, nondiscriminatory price promotions that are competitively beneficial to large and small brewers and wholesalers.

The impact of the post-off provisions upon price competition is significant. A variety of short-term price promotions available to large brewers, small brewers, and wholesalers is foreclosed by the cost of maintaining the decreased price for an excessive period. This anticompetitive impact is not outweighed by an important Twenty–First Amendment interest.

### The Uniform Delivered Price Requirement

The avowed Twenty–First Amendment reason for requiring uniform delivered pricing is administrative simplicity—to more easily identify the correct market price. However, in the past, the OLCC has authorized prices to be filed for as many as seven different zones. A determination of the correct market price simply requires reference to the location of the receiving retailer.

The anticompetitive effect of precluding market incentives to improve transportation efficiency is both real and significant. The post-off rule hinders the marketplace from working to improve transportation efficiency. The Commissioners of the OLCC have not carried their burden of proving that a single uniform delivered pricing system is necessary to achieve any Twenty–First Amendment interest.

### REMEDY

The challenged features of the Price Posting Rule violate the Sherman Act and are not shielded by the Twenty–First Amendment. An injunction enjoining further enforcement of the anticompetitive features of the Price Posting Rule shall issue. The injunction will be stayed for a

period of not more than ninety days from the date of this court's decision to enable the OLCC to draft and implement interim regulations consistent with the Sherman Act.

The foregoing opinion constitutes findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). The plaintiff shall prepare the appropriate judgment.