814 F.2d 720
 259 U.S.App.D.C. 191, 13 Media L. Rep. 2320
 CITY OF NEW YORK, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Cable Television Association, Inc., TeleCable
Corporation, Viacom International, Inc., Gill Industries,
National Association of Broadcasters, Association of Maximum
Service Telecasters, Inc., New York Citizens' Committee for
Responsible Media, National League of Cities, City of Miami,
Florida, City of Wheaton, Illinois, Post-Newsweek Cable,
Inc., City of Dallas, Texas, et al., Intervenors.
 No. 85-1841.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 26, 1986.
Decided March 20, 1987.
 
 Petition for Review of an Order of the Federal Communications commission.
 Robert Allan Garrett, with whom Paul S. Ryerson, Patrick J. Grant, Donald G. Frankel, Washington, D.C., for petitioner, City of New York and intervenors, City of Miami, Fla. and City of Wheaton, Ill., Cynthia Pols and Edward J. Walsh, Wheaton, Ill., for intervenor, National League of Cities, John J. Gunther, Washington, D.C., and Edward J. Perez, Los Angeles, Cal., for amici curiae, U.S. Conference of Mayors and the City of Los Angeles urging reversal.
 Gregory M. Christopher, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for respondents. John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondents.
 
 
 1
 Brenda L. Fox and Seth A. Davidson, Washington, D.C., for intervenor, National Cable Television Ass'n, Inc., Lisa A. Hook, New York City, for intervenor, Viacom Intern., Inc., and Paul Glist, Washington, D.C., for intervenor, TeleCable Corp., were on joint brief for intervenors, National Cable Television Ass'n, Inc., Viacom Intern., Inc., and Telecable Corp.
 
 
 2
 David G. Rozzelle and Kathryn Riley Dole, Washington, D.C., were on brief, for intervenor, Gill Industries, Inc.
 
 
 3
 Nicholas P. Miller, W. Randolph Young and Larrine S. Holbrooke, Washington, D.C., were on brief, for intervenors, City of Dallas, Tex., et al.
 
 
 4
 Robert T. Perry, New York City, was on brief, for intervenor, New York Citizens' Committee for Responsible Media.
 
 
 5
 Henry L. Baumann and Julian L. Shepard, Washington, D.C., entered appearances for intervenor, Nat. Ass'n of Broadcasters.
 
 
 6
 Gregory M. Schmidt and Paul G. Gaston, Washington, D.C., entered appearances for intervenor, Ass'n of Maximum Service Telecasters, Inc.
 
 
 7
 Mitchell Lazarus and David R. Anderson, Washington, D.C., entered appearances for intervenor, Post-Newsweek Cable, Inc.
 
 
 8
 Before MIKVA, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.
 
 
 9
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 
 
 10
 Opinion concurring in part and dissenting in part filed by Circuit Judge MIKVA.
 
 SILBERMAN, Circuit Judge:
 
 11
 This petition calls upon us to consider the authority of the Federal Communications Commission (FCC or Commission) to prohibit states and municipalities (franchisors or franchising authorities) from imposing upon cable television system operators technical requirements governing cable television signal quality. In October, 1985, the FCC promulgated a rule that both established federal technical standards for cable signal quality and forbade local cable franchising authorities from imposing standards of their own. Petitioner City of New York and various intervenors contend this rule exceeds the preemption authority granted the FCC by the Cable Communications Policy Act of 1984, Pub.L. No. 98-549, 98 Stat. 2779 (1984) (codified at 47 U.S.C. Secs. 521-559 (Supp. II 1984)) (hereinafter "Cable Act"). Petitioner also contends the FCC's failure to address certain objections made during the rulemaking process by several states and municipalities was arbitrary and capricious. For the reasons stated below, we hold the FCC's preemption of local technical standards for one particular class of cable channels falls within the Commission's statutory authority. However, because the FCC failed to consider the effect of the Cable Act's franchise renewal requirements on the propriety of its preemption of such standards for the other classes of cable channels, the FCC's rulemaking here was, within the meaning of the Administrative Procedure Act, 5 U.S.C. Sec. 551 et seq. (1982), arbitrary and capricious.
 
 I.
 
 12
 In the 1960s, the FCC began to address the various regulatory problems created by the rapid development of cable television services. The Commission decided that cable television was best regulated by a "deliberately structured dualism" whereby state and local authorities would grant franchises to cable operators within their communities, while the FCC would retain exclusive authority over all technical and operational aspects of cable communication. See Cable Television Report and Order, 36 F.C.C.2d 141, 207-210 (1972). Pursuant to that approach, the FCC in 1972 defined four categories of cable television service:
 
 
 13
 Class I--Cable channels devoted to delivering standard broadcast television signals;
 
 
 14
 Class II--Cable channels used for delivering non-encoded "cablecast" programming such as Cable News Network, ESPN, and public, educational, and governmental access programming;
 
 
 15
 Class III--Cable channels used for delivering encoded cablecast programming such as Home Box Office and other pay channels;
 
 
 16
 Class IV--Cable channels with two-way transmission capability allowing subscribers to return information to the control point.
 
 
 17
 See Cable Television Report and Order, 36 F.C.C.2d at 198-99. The FCC established minimum technical standards of signal quality only for Class I channels, leaving the signal quality of Class II, III, and IV channels unregulated. Id. at 200, 204. Shortly thereafter, however, local franchisors began imposing their own, more rigorous, technical standards as a condition of granting franchises to cable operators. After observing this experiment in local technical regulation for several years, the FCC concluded that allowing local jurisdictions to impose non-uniform technical standards was undesirable because, by subjecting cable operators to divergent and sometimes unworkable demands, this regime undermined the FCC's goal of promoting an efficient and innovative communications service. The Commission, therefore, promulgated a rule denying franchisors the power to impose technical standards more stringent than the FCC's standards. See Report and Order, 49 F.C.C.2d 470, 477-480 (1974). This regulatory scheme, including the preemption provision, was upheld in later years by the courts, see Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984); New York State Comm. on Cable Television v. FCC, 749 F.2d 804 (D.C.Cir.1984).
 
 
 18
 Against this backdrop, Congress enacted the Cable Communications Policy Act of 1984 to "clarif[y] the current system of local, state, and Federal regulation of cable television." H.R.Rep. No. 934, 98th Cong., 2d Sess. 19 (1984), U.S.Code Cong. & Admin.News 1984, p. 4655 (hereinafter "House Report "). The Cable Act sought to balance two conflicting goals: "preserv[ing] the critical role of municipal governments in the franchise process," House Report at 19, U.S.Code Cong. & Admin.News 1984, p. 4656, while affirming the FCC's "exclusive jurisdiction over cable service, and overall facilities which relate to such service...." House Report at 95, U.S.Code Cong. & Admin.News 1984, p. 4732. So, for example, the Cable Act allows local franchising authorities to continue selecting cable franchisees, Cable Act Sec. 621, 47 U.S.C. Sec. 541,[1] and to specify the facilities and equipment cable operators must make available, Cable Act Sec. 624(b), 47 U.S.C. Sec. 544(b). Yet the Act also circumscribes franchisors' regulatory authority: franchisors are prevented from regulating the services, facilities, and equipment provided by cable operators "except to the extent consistent with [the Cable Act]." Cable Act Sec. 624(a), 47 U.S.C. Sec. 544(a).
 
 
 19
 After the Cable Act's passage, the FCC reexamined its cable regulations. The Commission issued a notice of proposed rulemaking, 50 Fed.Reg. 7801 (1985), suggesting that its 1974 mandatory technical standards be reformulated as "guidelines" that local franchisors could choose to include in franchise agreements. The notice also proposed continuing the FCC's policy of preempting local technical standards that exceed federal standards. Id. at 7802. Approximately 120 comments and letters were generated by the notice, many of them from franchising authorities urging the FCC to either adopt a comprehensive set of mandatory technical standards or give franchisors the authority to enact such standards. The franchising authorities also argued the FCC's preemption policy was no longer permissible because it was inconsistent with the Cable Act. Other comments, primarily from cable operators, generally supported the FCC's proposal. On October 31, 1985, the FCC adopted its final Report and Order, Technical and Operational Requirements of Part 76 Cable Television, 50 Fed.Reg. 52,462 (1985) (hereinafter Report and Order ), relabelling its mandatory technical "rules" for Class I cable channels as "standards,"[2] which franchisors were authorized to include in franchise agreements, but prohibiting franchisors from imposing technical requirements that exceed those FCC standards. The Commission left Class II, III, and IV cable channels completely unregulated and prohibited franchisors from filling this gap, reasoning that competitive forces would encourage cable operators to provide adequate signal quality.
 
 
 20
 This petition followed. Petitioner City of New York and various intervenors (the National League of Cities, the City of Miami, and the City of Wheaton) raise numerous objections to the rule. Of these objections, we think two merit extended discussion.[3] First, petitioner argues that the manner in which the FCC has sought to preempt franchisors from enacting technical rules does not comport with the limitations on its preemption power established in various provisions of the Cable Act. Second, petitioner argues that without a comprehensive set of technical standards covering all four classes of cable channels, franchisors will be unable to fulfill effectively their responsibility to evaluate the quality of the cable signal when considering cable operators' applications for license renewal under section 626 of the Cable Act, 47 U.S.C. Sec. 546. Petitioner contends this latter concern was raised during the rulemaking proceeding, yet the FCC arbitrarily and capriciously failed to address it in violation of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982).
 
 
 21
 The first dispute essentially involves a disagreement about the scope of the FCC's preemption authority in light of Congress' passage of the Cable Act. "The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." Louisiana Public Service Comm. v. FCC, --- U.S. ----, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986). See also Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). When it considered and passed the Cable Act, Congress legislated against the background of the FCC's longstanding preemption policy--a policy containing two components: minimal FCC standards for Class I channels combined with a ban on more stringent franchisor-imposed Class I standards; and no FCC standards at all for Class II, III, and IV channels coupled with a complete prohibition of any franchisor-imposed standards. The Cable Act contains no provision that expressly terminates this longstanding preemption policy. Nor does either the statute or its legislative history contain specific indications that Congress disapproved of the FCC's policy. Indeed, the House Report on the Cable Act noted, without any indication of disapproval, the numerous judicial decisions upholding the FCC's authority over cable television, including two decisions, Capital Cities Cable, Inc. v. Crisp, and New York State Comm. on Cable Television v. FCC, supra at 723, that affirmed the FCC's authority to preempt local technical standards. House Report at 96.
 
 
 22
 The FCC contends that because the Cable Act did not expressly terminate this preexisting preemption policy, we must infer that Congress intended that entire policy to continue without modification. Petitioner, on the other hand, asserts that in adopting the Cable Act Congress comprehensively restructured the FCC's regulatory authority over cable television, and because Congress expressly sanctioned certain longstanding FCC regulations, the absence of an explicit endorsement of the Commission's preemption policy indicates Congress intended to terminate that policy.[4] 4] We think both parties' interpretations of congressional intent are unnecessarily extreme. Since Congress legislated against the backdrop of the Commission's preexisting preemption regulation without criticizing that regulation, we infer that Congress endorsed it, except where the Cable Act explicitly or implicitly modified its provisions.
 
 
 23
 To determine whether Congress intended to modify the FCC's prior preemption regulation we look first to the express language of the statute. In section 624(b)(1) of the Cable Act, Congress delegated to franchising authorities the right to "establish requirements for facilities and equipment" provided by a cable operator, 47 U.S.C. Sec. 544(b)(1).[5] But section 624(a) provides that a "franchising authority may not regulate the services, facilities, and equipment provided by a cable operator except to the extent consistent with [the Cable Act]," 47 U.S.C. Sec. 544(a) (emphasis added), thus clearly limiting a franchisor's freedom of action. And section 624(e)--"The Commission may establish technical standards relating to the facilities and equipment of cable systems ...," 47 U.S.C. Sec. 544(e) (emphasis added),--indicates the authority to curtail that freedom of action was delegated to the FCC, at least insofar as the FCC's "technical standards" overlap the franchisors' specifications of certain "services, facilities and equipment." The only item of legislative history bearing on the meaning of section 624(e) is consistent with that interpretation: "[T]his provision [section 624(e) ] does not affect the authority of a franchising authority to establish standards regarding facilities and equipment ... which are not inconsistent with standards established by the FCC under this subsection." House Report at 70, U.S.Code Cong. & Admin.News 1984, p. 4707 (emphasis added).
 
 
 24
 The FCC interprets the House Report phrase "not inconsistent with" as authorizing it to preempt any franchisor standard that "exceeds" the FCC's own standard. Petitioner argues, however, that "not inconsistent with" means "not contradictory." In other words, petitioner contends the Cable Act permits franchisors to require technical standards more onerous than the Commission's standard so long as no part of the franchisor's standard makes it impossible for the cable operator to comply with both the franchisor's and the FCC's specifications. Since the FCC's standards for Class I channels regulate only four of apparently twenty-four possible technical parameters that directly affect signal quality, see 47 C.F.R. Sec. 76.605(a)(7)-(10) (1985), petitioners assert they should be permitted to regulate any technical parameters the FCC left untouched.
 
 
 25
 We think the words "not inconsistent" are susceptible to both interpretations. Oxford's English Dictionary defines "inconsistent" as "not in accordance," 5 THE OXFORD ENGLISH DICTIONARY 173 (1973); Webster's defines it as "incompatible," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1144 (1971); and Black's prefers the definition "contradictory," BLACK'S LAW DICTIONARY 689 (5th ed. 1979). Normally, we would be obliged by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to defer to an agency's interpretation of an imprecise statute if Congress has not manifested a contrary intent in the legislative history. Here, the Chevron doctrine would apply a fortiori because the dispute centers on ambiguous language of a committee report which in turn describes general statutory wording. But whether Chevron deference is required in, or appropriate to, judicial review of an agency's assertion of preemption authority is unsettled. In Louisiana Public Service, supra at 724, a post-Chevron case in which the Supreme Court considered the Commission's exercise of preemption pursuant to imprecise statutory authority, Justice Brennan did not mention Chevron, 106 S.Ct. at 1898-1904. Yet in Crisp, supra at 723, decided only one week before Chevron, the Court upheld the FCC's decision that its general grant of regulatory authority under the 1934 Act to promote a "rapid, efficient" communications service permitted it to preempt state cable signal regulations. Justice Brennan, again speaking for the Court, reasoned that the Commission's preemption decision "plainly represents a reasonable accommodation of the competing policies committed to the FCC's care, and we see no reason to disturb the agency's judgment." 467 U.S. at 708, 104 S.Ct. at 2705. But see dissent at 729.
 
 
 26
 We do not need to decide whether deference is warranted, however, since we believe the FCC's interpretation of "inconsistent" the more persuasive. When it passed the Cable Act, Congress focused on the FCC's existing policy--just approved by the Supreme Court in Crisp--of preempting local cable technical standards, see supra at 724. But neither the Act's language nor any other piece of legislative history suggests Congress' intent to modify the FCC's past practice--at least with respect to Class I channels. But see dissent at 730-731. Petitioners thus place more weight on the phrase "not inconsistent with" than, without further support, it will bear.[6] The FCC's decision to preempt franchisors' technical regulations with its own Class I technical standards, minimal though they may be, cannot be said to exceed its statutorily delegated preemption authority; that broad authority allows the Commission to decide, as it did in this case, that a certain level of regulation is all that is desirable.[7]
 
 
 27
 A more difficult question is presented by petitioner's argument that the FCC cannot preempt franchisors' regulation of Class II, III, and IV channels without adopting any standards governing those channels.[8] To reject that argument squarely, we would be obliged to adopt the FCC's position that section 624(e) was, in this respect, designed to affirmatively endorse the FCC's entire past policy--permitting only the marketplace to govern the development of cable transmission quality. We are not required to resolve this question either, however, since we agree with petitioner's alternative argument that the FCC's failure to adopt standards for Class II, III, and IV appears in conflict with section 626 of the Cable Act and, absent consideration of the apparent conflict, its rulemaking was arbitrary and capricious.
 
 
 28
 Section 626 sets forth the procedure franchisors are to follow for renewing cable licenses and describes the bases upon which franchisors may conclude that renewal either is or is not warranted. Section 626(c)(1) provides that when a cable operator applies for renewal of a franchise, the franchising authority must either renew the franchise or preliminarily deny the application and, upon request, begin a public administrative proceeding to determine whether the cable operator's franchise ought to be renewed. The franchising authority is required to consider four factors when making such a determination, one of which is whether "the quality of the operator's service, including signal quality, response to consumer complaints, and billing practices ... has been reasonable in light of community needs." Cable Act Sec. 626(c)(1)(B), 47 U.S.C. Sec. 546(c)(1)(B) (emphasis added). When doing so it must follow familiar requirements of administrative due process.[9] If the authority denies a franchise renewal after a public administrative proceeding, that denial must be based on an "adverse finding" on, for example, the poor signal quality factor described above, Cable Act Sec. 626(d), 47 U.S.C. Sec. 546(d). In that event, the operator may bring suit in state or federal court alleging that the franchisor's failure to renew was improper, Cable Act Secs. 626(e)(1), 635(a), 47 U.S.C. Secs. 546(e)(1), 555(a). The court may grant "appropriate relief" if the franchising authority's finding of poor signal quality is "not supported by a preponderance of the evidence," Cable Act Sec. 626(e)(2)(B), 47 U.S.C. Sec. 546(e)(2)(B).
 
 
 29
 The Cable Act thus requires franchisors to consider the quality of a cable operator's signal when considering his renewal application. And a franchisor's determination that the operator's signal quality has been inadequate must be the product of reasoned decisionmaking. Petitioner argues that franchising authorities cannot evaluate reasonably a cable operator's signal quality without referring to objective technical standards; otherwise franchising authorities and cable operators alike would be cast into an endless series of subjective disputes over whether the section 626 renewal criterion of "signal quality" has been satisfied. We agree. The FCC's refusal to enact technical standards for Classes II, III, and IV, combined with its policy of forbidding franchisors from doing so, seems to put franchisors in a "Catch-22" position.
 
 
 30
 Several parties to the FCC's rulemaking proceeding brought this problem to the Commission's attention,[10] yet its Report and Order contains not a word about section 626.[11] Although an administrative agency certainly has no obligation to consider every comment raised during an informal rulemaking, it must nevertheless consider all "relevant factors," see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Since the FCC's rule appears to make it impossible for franchising authorities to fulfill conscientiously the renewal procedures imposed on them by section 626 of the Cable Act, the "relevance" of this consideration can hardly be questioned. Indeed, the apparent incompatibility between the FCC's rule and section 626 calls into question whether Congress intended that the Commission have the authority to preempt franchisors' signal quality standards and replace them with no standards at all--Congress' decision to require an objective assessment of cable operators' signal quality strongly suggests it intended someone, either the FCC or the franchisors, to establish objective standards for Class II, III, and IV channels. The Commission's use of its preemption authority to prohibit the enactment of such standards, then, may well have been in excess of its statutory authority. Still, without an adequate explanation from the FCC of the effect of section 626 on its preemption authority, we cannot (and do not) make this determination. In any event, the FCC had an obligation explicitly to consider the interrelationship between sections 626 and 624. That it chose not to makes its rulemaking here defective. See Independent U.S. Tanker Owners Committee v. Dole, 809 F.2d 847, 854 (D.C.Cir., 1987) (agency's failure to discuss how rule squares with statute's objective is arbitrary and capricious). We, therefore, vacate the FCC's rule as it relates to Class II, III, and IV channels and remand the case to the Commission for further proceedings consistent with this opinion.
 
 
 31
 So Ordered.
 
 
 32
 MIKVA, Circuit Judge, concurring in part and dissenting in part:
 
 
 33
 The court has struck down an attempt by the Federal Communications Commission to forbid local cable franchising authorities from imposing technical standards on Class II-IV cable channels. I concur in the majority's finding that with regard to these channels, the Commission improperly failed to consider the apparent incompatibility of its rule with section 626 of the Cable Act. Majority Opinion at 726-28. The court has upheld, however, the Commission's decision to preempt the local authorities from playing any meaningful role in regulating the signal quality of Class I channels. Id. at 724-26. The decision forces local authorities not to exceed federal guidelines that even the Commission has conceded are threadbare and outmoded. The majority recognizes that the Cable Act and accompanying legislative history do not clearly authorize the Commission's exercise of preemptive authority. Id. at 725. The majority nevertheless accedes to the Commission's interpretation. In my view, that interpretation is fanciful. More importantly, I believe the majority commits a serious error, and departs from established doctrine, in sanctioning preemption in the absence of a clear congressional mandate. I therefore dissent from that part of the majority opinion.
 
 
 34
 Preemption of local sovereignty by higher federal authority has always been a serious strain on our concept of federalism. While the Constitution clearly gives Congress the power to ordain preemption in those areas where Congress is empowered to act at all, the power has been used wisely when it has been used sparingly. As Justice Harlan has reminded us, "one of the great strengths of our federal system is that we have, in the forty-eight States, forty-eight experimental laboratories." Roth v. United States, 354 U.S. 476, 505, 77 S.Ct. 1304, 1320, 1 L.Ed.2d 1498 (1957) (Harlan, J., concurring and dissenting). Consistent with this principle, the Supreme Court has counseled repeatedly that a finding of preemption is appropriate only in the face of a clear manifestation of congressional intent. See Chicago & Northwestern Transportation Co. v. Kalo Brick and Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) ("Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons--either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' ") (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)); Schwartz v. Texas, 344 U.S. 199, 202-03, 73 S.Ct. 232, 234-35, 97 L.Ed. 231 (1952) ("It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed.") Most recently, the Court has reminded us that "[i]n determining whether a state statute is pre-empted by federal law ... our sole task is to ascertain the intent of Congress." California Federal Savings & Loan v. Guerra, --- U.S. ----, ----, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (emphasis added).
 
 
 35
 The majority's consideration of the preemption issue ignores these cautionary signals. Instead of conducting a rigorous examination of whether Congress has unmistakably ordained preemption, the majority concludes, on slender evidence, that the Commission's interpretation is the "more persuasive" reading of "ambiguous language," maj. op. at 726, and considers its inquiry satisfied. The majority also suggests that it may be appropriate for a court to defer to an agency's assertion of preemptive authority under the teachings of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The suggestion is alarming. An agency's assertion of federal preemptive authority is not equivalent to an agency's adoption of a rule to fit its statutory mission and cannot be an occasion for Chevron-style deference; rather, in administrative law no less than in other areas, preemption analysis "must be guided by respect for the separate spheres of governmental authority preserved in our federalist system." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981). In Chevron, the Supreme Court recognized the necessity of deferring to agency interpretations when Congress purposely has left a gap in the statute or has expressed no clear intent on the particular issue. 467 U.S. at 843-45, 104 S.Ct. at 2781-83. The teachings of the preemption cases, by contrast, suggest that in cases of statutory ambiguity or congressional silence it is critical not to assume Congress intended to preempt. Congress of course may delegate to an agency the power to issue certain preemptive regulations, if Congress does so in no uncertain terms. See Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984); Fidelity Federal Savings & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153-54, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664 (1981). This is not the same, however, as saying a court should defer to an agency's claim that Congress has in fact withdrawn the capacity of the states to act.
 
 
 36
 The Louisiana Public Service case cited by the majority is an instructive example, both because it was heard after Chevron and because it involved a claim of preemptive authority by the FCC. See Louisiana Public Service Comm. v. FCC, --- U.S. ----, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). (Significantly, the Louisiana Public Service opinion does not even mention Chevron.) In the face of the preemptive claim by the Commission, the Court re-emphasized that "the critical question in any preemption analysis is always whether Congress intended that federal regulations supersede state law." Id. at 1899. The Court acknowledged that the statute in question contained some "internal inconsistencies, vague language, and areas of uncertainty." Id. at 1904. Since the statute was ambiguous, under a Chevron analysis any reasonable agency interpretation should have been upheld, and the Court indeed indicated that the FCC's position was reasonable. Id. at 1903. ("[I]t is, no doubt, possible to find some support in the broad language of the section for respondent's position.") However, the Court gave no deference to the agency's interpretation, and it rejected the FCC's claim of preemptive authority. The case thus indicates that in the context of agency assertions of preemptive authority, the proper focus of inquiry is not whether an agency reasonably could conclude Congress intended to preempt but whether Congress in fact unmistakably so intended.
 
 
 37
 I do not pretend that the issue is entirely one-sided. At the very least, however, the question of whether to defer to an agency interpretation of preemptive authority brings into conflict two lines of teaching and the policies that underlie each. My appraisal of the conflict would be that the federalism concerns at the heart of preemption doctrine are far more compelling than the separation-of-power concerns at the heart of Chevron jurisprudence.
 
 
 38
 I also believe the Commission's position does not hold up to even deferential scrutiny. As the majority points out, a provision of the House Report contains Congress's most direct statement concerning whether the Cable Act permits states to promulgate technical standards more stringent than those established by the FCC. The provision read, "[Section 624(e) ] does not affect the authority of a franchising authority to establish standards regarding facilities and equipment ... which are not inconsistent with standards established by the FCC under this subsection." House Report at 70, U.S.Code Cong. & Admin.News 1984, p. 4707. I cannot agree that this provision is susceptible to the interpretation the FCC urges. The Commission's interpretation, under which federal standards install a ceiling on state regulation, is at odds with the dictionary definition of "inconsistent": more stringent local standards are neither "incompatible," in the sense of incapable of coexistence, see Webster's Third International Dictionary 1144 (1981), nor are they "mutually repugnant or contradictory; contrary, the one to the other, so that both cannot stand, but the acceptance or establishment of the one implies the abrogation or abandonment of the other." Black's Law Dictionary 689 (5th ed. 1979). More important, the Commission's interpretation is at odds with common sense. It is clear that once the Commission establishes federal standards for technical quality under 624(e), local franchisors must adhere to them. To say that local franchisors have no authority to impose more stringent standards is to say they have no authority at all, because less stringent regulations only track already binding federal requirements. The Commission's interpretation therefore degrades the House Report's statement of clear intent to preserve state authority into mere lip-service. I cannot endorse the cynical and illogical position that Congress was "protecting" states' authority to issue only redundant regulations to which franchisors already would be bound.
 
 
 39
 The majority strains to justify its decision by arguing that it still recognizes the states' ability to exercise certain authority, such as the authority to award franchises. Maj. op. at 726 n. 6. The issue, however, is not whether the opinion denies local forces any role whatsoever in cable regulation. The Committee Report expressly protects the states' exercise of a specified kind of authority, namely the authority "to establish standards regarding facilities and equipment." The majority opinion plainly emasculates that guarantee.
 
 
 40
 The sole evidence the majority offers for preferring the Commission's interpretation is that "Congress legislated against the backdrop of the Commission's pre-existing preemption regulation without criticizing that regulation." Maj. op. at 725. This kind of argument is rarely conclusive, all the less so in an area where the Supreme Court has required clear manifestation of congressional intention. In this case, it is even more specious. The Cable Communications Policy Act of 1984 was Congress's seminal effort to fashion a comprehensive policy for the cable industry. See House Report at 23. Existing regulatory schemes, conceived in cable's infancy or before, were inadequate to the burgeoning industry. Since Congress was constructing from the ground up, it is incongruous to presume it intended to preserve all elements of the previous makeshift approach unless it specifically disclaimed them. If anything, the opposite presumption--that Congress intended to preserve only those prior policies it expressly endorsed--is the more logical one. Indeed, certain provisions of the Act specifically codify past Commission policies. See, e.g., House Report at 56 (specifying that Section 613(a)(1) codifies Commission's television/cable cross-ownership ban).
 
 
 41
 The majority opinion fails to heed Supreme Court teachings on preemption, doing violence to some important notions of federalism and preemption that have served our republic well for some 200 years. Moreover, the majority accedes to a Commission interpretation that flatly contradicts the relevant legislative history. From such mischief, I dissent.
 
 
 
 [1]
 Section 2 of the Cable Act amended the Communications Act of 1934, 47 U.S.C. Sec. 151 et seq. (1982) ("1934 Act"), by adding a new Title VI, the provisions of which were identified in the Cable Act as sections 601-639. Upon codification, these sections were numbered as sections 521-559 of Title 47 of the United States Code
 
 
 [2]
 The Commission has used the terms "rules," "requirements," "regulations," "guidelines," and "standards" interchangeably. See, e.g., 50 Fed.Reg. 7801 (1985) ("quality performance standards," "regulations," "technical parameters," "technical rules," "technical standards," "technical requirements"). In the Report and Order at issue here, the Commission has apparently settled on using the term "standards" to describe its signal requirements
 
 
 [3]
 Intervenor the New York Citizens' Committee for Responsible Media contends that by precluding all technical regulation of Class II channels, the FCC arbitrarily and capriciously overlooked the possibility that cable operators would deliberately provide poor signal quality for public, educational, and governmental access (PEG) channels in an effort to discourage viewers from watching these channels. The intervenor correctly observes that the FCC failed to address this concern in its rule. While the Commission certainly had an obligation to consider all "relevant factors" in this informal rulemaking process, see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), there is also a limit to the potential problems the Commission must consider and discuss in its statement of basis and purpose, see Thompson v. Clark, 741 F.2d 401, 408-409 (D.C.Cir.1984). Purely speculative comments, for example, require no agency response, see Home Box Office v. FCC, 567 F.2d 9, 35 n. 58 (D.C.Cir.1977). The intervenor's concern evidently struck the Commission as so improbable and speculative, and so lacking any supporting evidence, that it did not merit consideration or acknowledgment. We are likewise unpersuaded that the intervenor's concern required the Commission's explicit consideration
 
 
 [4]
 Petitioner argues that Congress dealt with the FCC's concern about franchisors imposing unreasonably stringent technical standards, and thus displaced its preemption regulation, by including section 625(a)(1)(A), 47 U.S.C. Sec. 545(a)(1)(A), which provides that a cable operator may seek modification of his franchise agreement if that agreement contains "commercially impracticable" provisions. But this procedure leaves to the determination of the many franchisors what is or is not "commercially impracticable," and therefore hardly obviates the Commission's concern
 
 
 [5]
 The FCC contends that section 624(b)(1) only grants franchisors authority to specify generically the composition and configuration of the cable system (e.g., number of broadcasting studios, cameras, remote transmission vans, and satellite earth stations), and not the technical parameters of the cable signal. Under the Commission's interpretation of section 624, only the Commission may establish technical standards
 
 
 [6]
 The dissent's contention that the FCC's position "cynically" eliminates all franchisor authority under the Cable Act, dissent at 730, seems hyperbolic. Continuing authority to award franchises, see supra at 730, and to specify facilities and equipment, see note 5, supra, is unchallenged. Moreover, it is certainly possible--we do not decide--that franchisors may regulate signal quality if the FCC declines either to impose its own standards or to invoke its preemption authority
 
 
 [7]
 Petitioner also contends that, preemption aside, it was arbitrary and capricious of the FCC not to reexamine and update its cable signal standards in the face of comments asserting these standards were out of date. But, as petitioner concedes, the Commission did review and modify certain technical requirements in response to comments, Report and Order at 52,465. The Commission's decision not to modify other requirements is a matter surely entitled to great deference, see WWHT, Inc. v. FCC, 656 F.2d 807, 816-18 (D.C.Cir.1981), that we see no reason to challenge
 
 
 [8]
 The Commission has acknowledged the signal quality of Class II, III, and IV channels remains completely unregulated under the rule, see Report and Order at 52,463 & n. 4. At oral argument, however, the FCC's counsel contended that Class II, III, and IV channels are implicitly incorporated within the Class I technical standards because signals for each class of channels must be transmitted through one "tube" whose characteristics are regulated by virtue of the Class I standards. We cannot examine the Commission's position in light of appellate counsel's "post hoc rationalizations," see Investment Co. Institute v. Camp, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)), and therefore must look to the Commission's own representations
 
 
 [9]
 The franchisor must introduce, and allow the cable operator to introduce, evidence into the record; the franchising authority and the operator may question witnesses; a transcript of the proceeding must be prepared, Cable Act Sec. 626(c)(2), 47 U.S.C. Sec. 546(c)(2); and, at the conclusion of the proceeding, the franchising authority must issue a written decision granting or denying the renewal based upon a record that states the reasons for the decision, Cable Act Sec. 626(c)(3), 47 U.S.C. Sec. 546(c)(3)
 
 
 [10]
 To be sure, this was not the major focus of the franchising authorities' objections to the FCC's proposed rule. Yet the problem was raised by at least three different parties on four separate occasions. Although the FCC argues that it has no obligation to respond to each and every comment made during rulemaking, it does not contend that this objection was improperly raised
 
 
 [11]
 The FCC now contends that petitioner's concerns about the rule's effect on franchisors' renewal obligations are unfounded. Counsel for the Commission argues that franchisors can evaluate an operator's signal quality without reference to objective standards merely by bringing to the operator's attention consumer complaints about poor signal quality and asking the operator for an explanation. If the operator has no "satisfactory" explanation, the franchisors can safely deny the renewal. We cannot accept this argument. It begs the question of what is a "satisfactory" explanation--perhaps this can only be determined with reference to objective standards of satisfactory signal quality. More importantly, the Commission did not explicitly base its rulemaking on this position; it is instead merely a post-hoc rationalization offered by appellate counsel to which we cannot defer. See Investment Co. Institute v. Camp, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971)