541 So.2d 1129 (1989)
C. Leonard IVEY, et al., Appellants,
v.
BACARDI IMPORTS, CO., INC., et al., Appellees.
No. 73424.
Supreme Court of Florida.
March 23, 1989.
*1130 Robert A. Butterworth, Atty. Gen. and Daniel C. Brown, Asst. Atty. Gen., Tax Section, Tallahassee, for C. Leonard Ivey.
Gary R. Rutledge, Marguerite H. Davis and Paul R. Ezatoff, of Katz, Kutter, Haigler, Alderman, Eaton, Davis & Marks, P.A., Tallahassee, and Bruce Rogow, Fort Lauderdale, for Jacquin-Florida Distilling Co., Inc., and Todhunter Intern., Inc.
James L. Armstrong, III, Samuel C. Ullman of Kelley, Drye & Warren including Smathers & Thompson, Miami, and Steven Naclerio and Frederick J. Wilson, III of Bacardi Imports, Inc., Miami, for Bacardi Imports, Inc. and N. Goldring Corp.
Julius F. Parker, Jr., Jack M. Skelding, Jr. and Jennifer Parker LaVia of Parker, Skelding & Labasky, Tallahassee, and Thomas F. Connell and Teresa D. Baer of Wilmer, Cutler & Pickering, Washington, D.C., for The California Wine Institute and Tampa Wholesale Liquors Co., Inc.
*1131 EHRLICH, Chief Justice.
We have before us the direct appeal of a final judgment declaring the recent amendment to Florida's alcoholic beverage tax scheme, chapter 88-308, sections 10 and 11, Laws of Florida, which is codified at sections 564.06 and 565.12, Florida Statutes (Supp. 1988), unconstitutional under the commerce clause. The First District Court of Appeal has certified the cause as one involving a question of great public importance requiring immediate resolution. We have jurisdiction, article V, section 3(b)(5), of the Florida Constitution, and affirm.
Recently, in Division of Alcoholic Beverages and Tobacco v. McKesson Corp., 524 So.2d 1000 (Fla.), cert. granted, ___ U.S. ___, 109 S.Ct. 389, 102 L.Ed.2d 378 (1988),[1] this Court held provisions of sections 564.06 and 565.12, Florida Statutes (1985), which granted tax exemptions or tax preferences to alcoholic beverages made from certain agricultural crops which grow in Florida, regardless of the place of manufacture, invalid under the commerce clause. Prior to the 1985 amendment, sections 564.06 and 565.12, Florida Statutes (Supp. 1984), granted tax-preferred treatment to alcoholic beverages made from certain base crops grown in Florida and manufactured and bottled in Florida. The 1985 amendment to sections 564.06 and 565.12 was implemented in response to the 1984 United States Supreme Court decision in Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984). In Bacchus, a Hawaii liquor tax which exempted certain locally produced alcoholic beverages was struck down as being violative of the commerce clause because it had both the purpose and effect of discriminating in favor of local products.
Relying on Bacchus, the plaintiffs in McKesson took the position that because the 1985 amendment to sections 564.06 and 565.12 had both the purpose and effect of discriminating against interstate commerce, the challenged provisions were properly struck down by the trial court as "simple economic protectionism." 524 So.2d at 1003. After setting forth the two-tiered approach[2] to analyzing state economic regulation under the commerce clause, as recently explained by the United States Supreme Court in Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), we concluded that because the provisions at issue "place[d] a clear discriminatory burden on interstate commerce which the state ha[d] failed to justify in terms of legitimate local benefits other than the admitted benefits to local industry flowing from the statute, [there was no need to] determine whether the challenged provisions were in fact enacted to serve some underlying protectionist purpose." 524 So.2d at 1005. We went on to reject intervenor Jacquin's contention that even if the 1985 tax scheme was found to burden interstate commerce, it "is entitled *1132 to `great deference because of the Twenty-first Amendment grant to the individual states of extraordinary powers to regulate alcoholic beverages.'" Id. at 1009. Citing Bacchus and Brown-Forman, we concluded that the tax scheme was not entitled to such deference because it furthered no clear concern of the twenty-first amendment. Id.
In response to our McKesson decision which was released during the 1988 legislative session, the Florida Legislature enacted sections 9 through 11 of chapter 88-308, Laws of Florida. Sections 10 and 11 of chapter 88-308 amend the 1985 tax scheme. Section 9 of chapter 88-308, as codified in section 561.495, Florida Statutes (Supp. 1988), states the legislative policy in regard to the importation of alcoholic beverages:
Effective July 1, 1988, the Legislature finds and determines that the authorized transportation and importation into the state of alcoholic beverages described in chapters 564 and 565 require strict enforcement of state statutes regulating and administering the manufacture, distribution and sale of alcoholic beverages; the costs of regulating and administering such imported alcoholic beverages are greater than for those alcoholic beverages not imported; the production of lower quality alcoholic beverages should be discouraged; and in order to protect the health, safety, welfare, and economic integrity of the state, the costs of ensuring compliance with relevant state laws should be included in the taxes imposed upon said alcoholic beverages.
Sections 10 and 11 of the law, as codified in section 564.06 and 565.12, Florida Statutes (Supp. 1988), respectively, provide for an excise tax on wines and distilled spirits as well as an import tax on wines and distilled spirits which are imported into the state. Subsection 565.12(4) provides that all beverages distilled in this state for sale in this state, except flavoring extracts, shall be distilled above 185 proof and shall be made from produce grown on land inspected by Florida agricultural inspectors. Subsection 564.06(7) provides that all fortified beverages taxed under that section shall be fortified with alcohol, except for flavoring extracts, distilled above 185 proof and shall also be made from produce grown on land inspected by Florida agricultural inspectors. Sections 564.06 and 565.12 provide in pertinent part:
564.06 Excise and import taxes on wines and beverages. 
(1)(a) As to beverages including wines, except natural sparkling wines and malt beverages, containing 0.5 percent or more alcohol by volume and less than 17.259 percent alcohol by volume, there shall be paid by all manufacturers and distributors a tax at the rate of $.25 per gallon.
(b) In addition to the tax imposed under paragraph (a), there shall be imposed upon the importation into this state of all beverages including wines, except natural sparkling wines and malt beverages, containing 0.5 percent or more alcohol by volume and less than 17.259 percent alcohol by volume, an import tax in the amount of $2.00 per gallon to be paid by manufacturers and distributors.
(c) The taxes imposed under paragraphs (a) and (b) shall be paid together in order to facilitate the collection of these taxes and to ensure that these taxes will only be collected once in accordance with s. 561.50.

*1133 (2)(a) As to all wines, except natural sparkling wines, containing 17.259 percent or more alcohol by volume, there shall be paid by manufacturers and distributors a tax at the rate of $.50 per gallon.
(b) In addition to the tax imposed under paragraph (a), there shall be imposed upon the importation into this state of all wines, except natural sparkling wines, containing 17.259 percent or more alcohol by volume, an import tax in the amount of $2.50 per gallon to be paid by manufacturers and distributors.
(c) The taxes imposed under paragraphs (a) and (b) shall be paid together in order to facilitate the collection of these taxes and to ensure that these taxes will only be collected once in accordance with s. 561.50.
(3)(a) As to natural sparkling wines, there shall be paid by all manufacturers and distributors a tax at the rate of $1.50 per gallon.
(b) In addition to the tax imposed under paragraph (a), there shall be imposed upon the importation into this state of natural sparkling wines an import tax in the amount of $2.00 per gallon to be paid by manufacturers and distributors.
(c) The taxes imposed under paragraphs (a) and (b) shall be paid together in order to facilitate the collection of these taxes and to ensure that these taxes will only be collected once in accordance with s. 561.50.
(4)(a) As to wine coolers, which are a combination of wines containing 0.5 percent or more alcohol by volume, carbonated water, and flavors or fruit juices and preservatives and which contain 1 to 6 percent alcohol content by volume, there shall be paid by all manufacturers and distributors a tax at the rate of $.75 per gallon.
(b) In addition to the tax imposed under paragraph (a), there shall be imposed upon the importation into this state of wine coolers as described in paragraph (a) an import tax in the amount of $1.50 per gallon to be paid by manufacturers and distributors.
(c) The taxes imposed under paragraphs (a) and (b) shall be paid together in order to facilitate the collection of these taxes and to ensure that these taxes will only be collected once in accordance with s. 561.50.
.....
(7) All beverages taxed under paragraphs (1)(a), (2)(a), (3)(a), or (4)(a) and manufactured within this state for sale in this state, if fortified, shall be fortified with alcohol, except for flavoring extracts, distilled above 185 proof from produce of agricultural land inspected by Florida agricultural inspectors. All wines taxed under paragraphs (1)(a), (2)(a), (3)(a) or (4)(a) and manufactured within this state for sale in the state shall be made of produce from land inspected by Florida agricultural inspectors.
(8) The excise and import taxes required to be paid by this section are not required to be paid upon any alcoholic beverage sold to a post exchange, ship service store, or base exchange located in a military, naval, or air force reservation within this state.
.....
(10) Until October 1, 1994, 50 percent of all revenues collected from the excise taxes imposed by this section on wine produced by Florida manufacturers from products grown in the state must be deposited into the Viticulture Trust Fund established pursuant to s. 599.012. All revenue collected pursuant to subsections (11) and (12) [sic] shall go directly to the Department of Business Regulation to provide funds to administer the provisions contained herein.
(11) It is the legislative intent that if any amendatory provision of s. 10, ch. 88-308, Laws of Florida, is held invalid by an interlocutory decree, while in effect, or final decree or order of a court of competent jurisdiction, the provisions of this section as it existed on the day prior to the effective date of s. 10, ch. 88-308, Laws of Florida, shall then be revived and shall be the law of this state, except as to such provisions of this section which have heretofore been held unconstitutional by the Florida Supreme Court, and except that any amendments to such section enacted other than by s. 10, ch. 88-308, Laws of Florida, shall be preserved and continue to operate to the extent that such amendments are not dependent upon the portions of said section which expire pursuant to the provisions of s. 10, ch. 88-308, Laws of Florida.
565.12 Excise and import tax on liquors and beverages. 
(1)(a) As to beverages containing 17.259 percent or more of alcohol by volume and not more than 55.780 percent of alcohol by volume, except wines, there shall be paid by every manufacturer and distributor a tax at the rate of $4.75 per *1134 gallon. As to beverages containing less than 17.259 percent of alcohol by volume, there shall be paid by every manufacturer and distributor a tax at the rate provided in chapter 564.
(b) In addition to the tax imposed under paragraph (a), there shall be imposed upon the importation into this state of beverages containing 17.259 percent or more of alcohol by volume and not more than 55.780 percent of alcohol by volume, an import tax in the amount of $1.75 per gallon to be paid by every manufacturer and distributor.
(c) The taxes imposed under paragraphs (a) and (b) shall be paid together in order to facilitate the collection of these taxes and to ensure that these taxes will only be collected once in accordance with s. 561.50.
(2)(a) As to beverages containing more than 55.780 percent of alcohol by volume, there shall be paid by every manufacturer and distributor a tax at the rate of $5.95 per gallon.
(b) In addition to the tax imposed under paragraph (a), there shall be imposed upon the importation into this state of beverages containing more than 55.780 percent of alcohol by volume, an import tax in the amount of $3.58 per gallon to be paid by every manufacturer and distributor.
(c) The taxes imposed under paragraphs (a) and (b) shall be paid together in order to facilitate the collection of these taxes and to ensure that these taxes will only be collected once in accordance with s. 561.50.
(3) The excise and import taxes required to be paid by this section are not required to be paid upon any alcoholic beverage sold to a post exchange, ship service store, or base exchange located in a military, naval, or air force reservation within this state.
(4) All beverages distilled in this state for sale in this state shall be distilled above 185 proof, except for flavoring extracts, of produce from land inspected by Florida agricultural inspectors.
.....
(6) It is the legislative intent that if any amendatory provision of s. 11, ch. 88-308, Laws of Florida, is held invalid by an interlocutory decree, while in effect, or final decree or order of a court of competent jurisdiction, the provisions of this section, as it existed on the day prior to the effective date of s. 11, ch. 88-308, Laws of Florida, shall then be revived and shall be the law of this state, except as to such provisions of this section, which have heretofore been held unconstitutional by the Florida Supreme Court and except that any amendments to such section enacted other than by s. 11, ch. 88-308, Laws of Florida, shall be preserved and continue to operate to the extent that such amendments are not dependent upon the portions of said section which expire pursuant to the provisions of s. 11, ch. 88-308, Laws of Florida.
The Division of Alcoholic Beverages and Tobacco (DABT) has interpreted these provisions to require that beverages be made in Florida, from produce of land inspected by Florida agricultural inspectors and, where appropriate, be distilled above 185 proof to be exempt from the import tax.
Bacardi Imports, Inc., an importer of alcoholic beverages, and N. Goldring Corp., a distributor of imported alcoholic beverages, filed suit against C. Leonard Ivey, Director of the DABT, contending that the import tax violated the commerce clause, the export-import clause, and the equal protection clause of the United States Constitution. The California Wine Institute and Tampa Wholesale Liquors Co., Inc. intervened as plaintiffs. Jacquin-Florida Distilling Co., Inc., and Todhunter International, Inc., Florida manufacturers of alcoholic beverages, intervened as defendants.
After a hearing to determine whether any legitimate twenty-first amendment purpose was furthered by the "clearly discriminatory" tax scheme, the same trial judge who held provisions of the 1985 tax scheme unconstitutional found "that this statute is but a warmed-over version, dressed up in different clothing" of the tax scheme which was held invalid in McKesson. *1135 The trial court found the twenty-first amendment purposes allegedly served by the legislation "illusory" and, therefore, insufficient to "save that which is so clearly discriminatory." The trial judge noted that his conclusion might have been different if the state had an inspection or quality control program to protect its citizens. But the state did not have at the time of hearing nor had it ever had an alcoholic beverage quality control program or an inspection program for the land upon which crops used in the production of such beverages are grown. The court held
the provisions of Section 10(1) of Chapter 88-308, Laws of Florida, amending § 564.06, Florida Statutes; and the provisions of Section 11(1) of Chapter 88-308, Laws of Florida, amending § 565.12, Florida Statutes ... to be in contravention of ... the Commerce Clause and to be therefore null, void, and of no effect.
The court's ruling was prospective in nature.[3]
Ivey and intervenors Jacquin and Todhunter appealed to the First District Court of Appeal which certified the cause to this Court as involving a question of great public importance requiring immediate resolution.
The appellees take the position that because the provisions at issue have the clear purpose and effect of discriminating against out-of-state wines and distilled spirits they are per se unconstitutional under the Bacchus and McKesson decisions. They maintain that the protectionist purpose behind the 1988 amendment is evidenced by the fact that nowhere in committee or floor debates on the bill amending the tax scheme were any of the concerns set forth in section 9 discussed but rather every person who spoke of the measure described it as an aid to Florida industry. The appellees also point out that the amended tax scheme discriminates against interstate commerce in the same fashion as the excise tax scheme which was stricken in McKesson, because out-of-state beverages, which are subject to both the excise and the import taxes, are taxed at a rate from $1.50 to $3.58 per gallon higher than Florida-produced beverages.
Appellant Ivey does not take issue with the trial court's conclusion that these provisions clearly discriminate against interstate commerce. However, he contends that the Bacchus and McKesson decisions, which he characterizes as "pure Commerce Clause" cases, were misapplied in this case. He maintains that unlike the statutes at issue in those cases, sections 9 through 11 of chapter 88-308 rest squarely on the twenty-first amendment and constitute a direct exercise of Florida's constitutional power under that amendment. Section 2 of the twenty-first amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2. It is Ivey's position that "when a state acts to control or regulate the importation of alcoholic beverages under the twenty-first amendment, its decisions in that regard are `unfettered by the Commerce Clause,' Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939), and `totally unconfined by traditional Commerce Clause limitations.' Joseph E. Seagram & Son's, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966)." Therefore, he argues that this otherwise discriminatory tax scheme must be upheld if it addresses "a valid Twenty-first Amendment purpose ... in a rational manner." Ivey maintains that the provisions further twenty-first amendment concerns by "encourag[ing] a distribution structure over which the State has maximum regulatory control, seek[ing] to reduce the health risks associated with the consumption of alcoholic beverages, and fairly apportion[ing] the societal costs of such consumption, while furthering the first two objectives."
Ivey relies on the United States Supreme Court's early decisions examining the interplay between the twenty-first amendment and the commerce clause. In State Board of Equalization v. Young's Market Co., *1136 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936), a California license fee of $500 for the privilege of importing beer into the state was challenged as violative of the commerce and equal protection clauses of the United States Constitution. In Young's Market, the Supreme Court took a broad view of the twenty-first amendment. While acknowledging that prior to the enactment of the twenty-first amendment the license fee would place an unconstitutional burden on interstate commerce, the Court upheld the fee, reasoning that the amendment's prohibition against "the `transportation or importation' of intoxicating liquors into any state `in violation of the laws thereof,' abrogated the right to import free, so far as concerns intoxicating liquors." 299 U.S. at 62, 57 S.Ct. at 78. Three years later, in Ziffrin, Inc. v. Reeves, 308 U.S. 132, 138, 60 S.Ct. 163, 167, 84 L.Ed. 128 (1939), the Court reaffirmed the broad view taken in Young's Market, stating that "[t]he Twenty-first Amendment sanctions the right of a state to legislate concerning intoxicating liquors brought from without, unfettered by the Commerce Clause."
However, we agree with appellees that under a more recent line of cases, culminating in the Bacchus decision, the proper analysis to be employed where it is maintained that twenty-first amendment concerns save an otherwise discriminatory state law from attack under the commerce clause is "whether the principles underlying the Twenty-first Amendment are sufficiently implicated by [that law] to outweigh the Commerce Clause principles that would otherwise be offended." Bacchus, 468 U.S. at 275, 104 S.Ct. at 3057.[4] The majority in Bacchus explained:
Despite broad language in some of the opinions of this Court written shortly after ratification of the Amendment, more recently we have recognized the obscurity of the legislative history of § 2. See California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc., 445 U.S. 97, 107, n. 10, 100 S.Ct. 937, 944, n. 10, 63 L.Ed.2d 233 (1980). No clear consensus concerning the meaning of the provision is apparent... .
It is by now clear that the Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause. For example, in Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 331-332, 84 S.Ct. 1293, 1297-1298, 12 L.Ed.2d 350 (1964), the Court stated: "To draw a conclusion ... that the Twenty-first Amendment has somehow operated to `repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would, however, be an absurd oversimplification." We also there observed that "[b]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution [and] each must be considered in light of the other and in the context of the issues and interests at stake in any concrete case." Id., at 332, 84 S.Ct., at 1298. Similarly, in Midcal Aluminum, supra, 445 U.S. 97 at 109, 100 S.Ct. [937] at 945 [63 L.Ed.2d 233 (1980)], the Court, noting that recent Twenty-first Amendment cases have emphasized federal interests to a greater degree than had earlier cases, described the mode of analysis to be employed as a "pragmatic effort to harmonize state and federal powers." The question in this case is thus whether the principles underlying the Twenty-first Amendment are sufficiently implicated by the [state regulation at issue] to outweigh the Commerce Clause principles that would otherwise be offended. Or as we recently asked in a slightly different way, "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *1137 Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 714, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984).
468 U.S. at 274-76, 104 S.Ct. at 3057-57 (emphasis added; footnotes omitted).
The tax scheme at issue was modeled after Georgia's import tax on alcoholic beverages which was recently upheld by the Georgia Supreme Court in Heublein, Inc. v. State, 256 Ga. 578, 351 S.E.2d 190, appeal dismissed, 483 U.S. 1013, 107 S.Ct. 3253, 97 L.Ed.2d 753 (1987).[5] In Heublein, the court employed the balancing approach set forth in Bacchus to uphold a discriminatory import tax on distilled spirits and wines, because "the unchallenged purpose of the import tax implicate[d] central concerns of the Twenty-first Amendment, i.e., defraying the increased costs of regulating the importation into this state of intoxicating liquors." Id. at 584-85, 351 S.E.2d at 196. The import tax which was upheld in Heublein was based on legislative findings similar to those set forth in section 9.[6] However, unlike the plaintiffs in the instant case, the plaintiffs in Heublein did not challenge the Georgia general assembly's stated purpose for the import tax. They simply conceded the existence of twenty-first amendment concerns and argued that whatever the underlying purpose, "`it doesn't fly in light of the Commerce Clause.'" Id. at 584, 351 S.E.2d at 196.
In the instant case, the trial court found the twenty-first amendment concerns set forth by the Florida Legislature in section 9 "illusory," and therefore insufficient to save this "clearly discriminatory" tax scheme. Even if the findings set forth by the legislature are not totally "illusory," the record in this case leads us to conclude that the interests which the state maintains are furthered by this legislation are not substantial enough to outweigh the federal interest in free and unrestricted trade among the several states.
In determining the substantiality of an asserted twenty-first amendment concern, the United States Supreme Court looks to the "approach" a state takes in addressing that concern. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 715, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984). In Capital Cities Cable, an Oklahoma regulation prohibiting cable television operators in the state from retransmitting out-of-state signals containing advertisements for certain alcoholic beverages was found to be preempted by Federal Communications Commission regulations with which that regulation conflicted. The Court found that the advertising ban was not saved from preemption by the twenty-first amendment. In making this determination, the Court looked to the "substantiality" of the state's asserted interest in discouraging consumption of intoxicating liquor. The Court considered the trial court's finding that "`consumption of alcoholic beverages *1138 in Oklahoma has increased substantially in the last 20 years despite the ban on advertising of such beverages.'" 467 U.S. at 715, 104 S.Ct. at 2708. The Court concluded that "[t]he modest nature of Oklahoma's interest" was further illustrated by the fact that Oklahoma chose "not to press its campaign against alcoholic beverage advertising on all fronts," permitting "both print and broadcast commercials for beer, as well as advertisements for all alcoholic beverages contained in newspapers, magazines, and other publications printed outside of the State." Id. Since the ban at issue was directed only at wine commercials that occasionally appeared on out-of-state signals carried by cable operators, the Court concluded that "[b]y their own terms ... the State's regulatory aims ... are narrow." Id. The Court went on to explain:
Although a state regulatory scheme obviously need not amount to a comprehensive attack on the problems of alcohol consumption in order to constitute a valid exercise of state power under the Twenty-first Amendment, the selective approach Oklahoma has taken toward liquor advertising suggests limits on the substantiality of the interests it asserts here. In contrast to state regulations governing the conditions under which liquor may be imported or sold within the State, therefore, the application of Oklahoma's advertising ban to the importation of distant signals by cable television operators engages only indirectly the central power reserved by § 2 of the Twenty-first Amendment  that of exercising "control over whether to permit importation or sale of liquor and how to structure the liquor distribution system."
Id. (citations omitted). The Court then measured the state's "limited interest" against the "significant interference" with federal objectives, concluding that "the State's interest is not of the same stature as the goals identified in the FCC's rulings and regulations." Id. at 715-16, 104 S.Ct. at 2708-09. Since the state's "central power under the Twenty-first Amendment of regulating the times, places, and manner under which liquor may be imported and sold [was] not directly implicated [by the ban], the balance between state and federal power tip[ped] decisively in favor of the federal law." Id.
In the instant case, the approach the state has taken to address the alleged twenty-first amendment concerns suggests "limits on the substantiality" of the interests it asserts similar to those evidenced in Capital Cities Cable. Further, the premise that the costs of regulating and administering imported alcoholic beverages are greater than those for domestic alcoholic beverages is erroneous. It is clear from the record that it actually costs less on a per gallon basis to regulate and administer imported alcoholic beverages than it does to regulate and administer alcoholic beverages manufactured in state. In fact, it appears that, prior to passage of the amendment, DABT officials informed the legislature that "the cost to regulate the imported products on a per gallon basis will be lower than the cost to regulate non-imported products." Memorandum from Pedro M. Gonzalez, Chief, Bureau of Audit Operations, DABT to C.L. Ivey, Dir., DABT (May 25, 1988) (Re: Cost of Regulating Alcoholic Beverages Under Proposed CS for SB 1326). Further, there was no evidence presented of laws or regulations, other than the one at issue, which are peculiar to imported beverages or which would result in added costs in connection with those beverages.
Ivey's contention that the "tax distribution formula of Ch. 88-308 fairly apportions the total tax burden on imported and domestic products in relation to their contributions to the problems of alcohol in this State" is equally unavailing. Imports account for 97.54% of the wine and liquor consumed within the state each year but account for 98.06% of the total alcoholic beverage tax collected on those products. Even assuming that the revenue generated under the import tax will be used to address "the problems of alcohol [consumption] in this State," under this scheme imported beverages bear more than their fair serve of the tax burden. While Ivey offered substantial evidence of the "societal *1139 costs" alcohol use within the state causes or is associated with, no evidence was offered demonstrating that imported beverages account for more of these costs than is represented by their proportionate share of the market. If the purpose of the tax scheme were to fairly apportion the tax burden based on the contribution imported alcoholic beverages make to the problems of alcohol consumption in this state, this could be accomplished by assessing the same tax for both imported and domestic beverages. In that case, the share of the tax burden borne by imported beverages would be equal to their proportionate share of the market.
Ivey maintains that the requirement that alcoholic beverages distilled in the state for sale in the state be distilled above 185 proof, coupled with an import tax encouraging consumption of such beverages, rationally furthers health objectives of the state under the twenty-first amendment. The appellants offered testimony of toxicologist Dr. Teaf that certain chemicals (ethyl carbamate (urethane), isoamyl alcohol, n-butyl alcohol, propyl alcohol, n-butyric acid) which occur naturally in alcoholic beverages during the fermentation process have the potential to cause toxic effects in human beings. The parties stipulated to the fact that the greatest concentration of the compounds in question are removed when subjected to distillation above 185 proof. The appellees maintain that the health concerns urged by Ivey are illusory because there is "no evidence that at the levels found in alcoholic beverages, any of the identified substances are harmful or cause genotoxic or toxic effects in man." They further contend that such health concerns are not central concerns of the twenty-first amendment.
Even if the purported health concerns were supported by the evidence and were considered valid twenty-first amendment concerns, the selective approach employed by the legislature evidences the limited nature of the health interest being furthered by these provisions. The tax scheme provides no incentive for the distillation at over 185 proof of imported beverages, which account for over 97% of the wine and distilled spirits consumed within the state. Nor does it encourage the consumption of vodka, which by federal law must be distilled at 190 proof or higher, 27 C.F.R., Subpart C, § 5.22(a) (1988), or of other imported alcoholic beverages which actually are distilled at over 185 proof. The tax scheme does not discourage the consumption of beer which is fermented but not distilled and, therefore, contains urethane as a natural by-product. Flavoring extracts which are used in Florida-manufactured beverages are exempt from the 185 proof requirement. According to testimony, several of the suspect substances are used as flavoring in certain beverages manufactured in this state by appellant Jacquin. Therefore, under the statute, the very substances which are removed by distillation at over 185 proof may be added to Florida-manufactured beverages as flavoring. There is no evidence that these substances are any less of a potential health risk if added to a beverage as flavoring than they are if not removed by distillation at 185 proof or above. Further, as the trial court found, there is no quality control inspection program for either domestic or imported beverages.[7] The clearly selective approach taken to eliminate the alleged health risks and the relative inconsequential health benefits attained under that approach demonstrate the minimal nature of the asserted interest. This limited state interest is clearly inadequate to outweigh the substantial federal interest in preventing economic protectionism.
The asserted interest in enhancement of the state's regulatory control over the distribution chain of wines and distilled spirits is likewise insufficient to outweigh the clear federal interest implicated. Ivey relies on testimony of John Harris, Chief of the Bureau of Law Enforcement, DABT, to establish that the state has greater regulatory control over Florida manufacturers than it has over out-of-state manufacturers *1140 of alcoholic beverages. Mr. Harris conducts criminal and administrative investigations into violations of Florida's beverage laws and conducts background investigations of persons seeking licenses to manufacture and sell beverages in Florida. Mr. Harris testified that, in his opinion, the DABT has greater regulatory control over alcoholic beverage manufacturers who are located in Florida than manufacturers who are located out-of-state. This opinion was based on Mr. Harris' belief that the DABT has more regulatory clout based on its ability to revoke an in-state manufacturer's license[8] for failure to comply with Florida laws than it has based on its ability to revoke an out-of-state manufacturer's brand registration.[9] Even if we accept the premise that the DABT has greater regulatory clout over in-state manufacturers, relocation of foreign manufacturers to Florida, where they will be subject to state licensure requirements, would be at best "an occasional and accidental effect"[10] of this discriminatory tax scheme.
In light of the clearly limited interests furthered by the challenged provisions, we do not believe that twenty-first amendment concerns are sufficiently implicated to allow this clearly discriminatory tax scheme to stand. Accordingly, the judgment of the trial court holding subsections 564.06(1) through (10) and subsections 565.12(1) through (5), Florida Statutes (Supp. 1988), unconstitutional is affirmed.
It is so ordered.
OVERTON, McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The Supreme Court will address the prospective nature of the rulings in McKesson.
[2] a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. See, e.g., Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); Shafer v. Farmers Grain Co., 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925); Edgar v. MITE Corp., 457 U.S. 624, 640-43, 102 S.Ct. 2629, 2639-41, 73 L.Ed.2d 269 (1982) (plurality opinion). When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). We have also recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the Pike v. Bruce Church [Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)] balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity. See, Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, 440-441, 98 S.Ct. 787, 793-94, 54 L.Ed.2d 664 (1978)."
Division of Alcoholic Beverages and Tobacco v. McKesson Corp., 524 So.2d 1000, 1003 (Fla.) (quoting Brown-Forman Distillers Corp. v. New York State Liquor Author., 476 U.S. 573, 106 S.Ct. 2080, 2084-85, 90 L.Ed.2d 552 (1986)), cert. granted, ___ U.S. ___, 109 S.Ct. 389, 102 L.Ed.2d 378 (1988).
[3] The appellees do not challenge the prospective nature of the ruling.
[4] The dissent in Bacchus supports this conclusion. After an indepth analysis of the Court's decisions in this area, Justice Stevens concluded that the majority has taken "a totally novel approach to the Twenty-first Amendment." Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 286-87, 104 S.Ct. 3049, 3063-64, 82 L.Ed.2d 200 (1984) (Stevens, J., dissenting).
[5] In explaining the amendment to Senate Bill 1326, which was enacted as sections 9 through 11 of chapter 88-308, Laws of Florida, before the Florida Senate Finance, Tax and Claims Committee, Senator Robert Crawford stated:

[T]he State of Georgia had another differential tax [on alcoholic beverages] and they had the same [commerce clause] problem as we did. So they actually had their tax challenged, it was upheld, and I think cert. was denied to the Supreme Court so we think we have now the right way of delivering this tax and this bill would then rewrite [the tax scheme which was held unconstitutional in McKesson] so that distilleries in Florida do have a small preference over out-of-state and this is an attempt to make that law constitutional.
Fla.S.Comm. on Fin., Tax & Claims, transcript of proceedings (May 19, 1988) (CS for SB 1326) (statement of Senator Robert Crawford).
[6] The preamble to the Georgia act at issue in Heublein stated, among its purposes, "to provide for the increased cost of administration and collection of revenues; to aid in the exercise of police power; to promote temperance ..." 1985 Ga. Laws p. 665. In section 1 of the Act the Georgia general assembly found:

that the cost of regulating and administering the manufacture, distribution, and sale of alcohol, distilled spirits, table wines, and dessert wines consumed in this state is greater for imported alcohol, distilled spirits, table wines, and dessert wines than it is for alcohol, distilled spirits, table wines, and dessert wines produced within this state and further finds and determines that it is in the best interest of the citizens of this state that the increased costs be provided for by taxation.
Id.
[7] Nor is there an agricultural inspection program for crops grown in Florida which are used in the manufacture of alcoholic beverages. This requirement has not been shown to further either health or regulatory concerns.
[8] A license is required for in-state manufacturers of wines and liquors, pursuant to sections 564.02(2) and 565.03, Florida Statutes (1987), respectively.
[9] A brand registration is required for all out-of-state manufacturers of wines and liquors who wish to sell their products in Florida, pursuant to sections 564.041 and 565.09, Florida Statutes (1987), respectively.
[10] New Energy Co. v. Limbach, 486 U.S. 269, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988) (health justifications for discriminatory tax scheme which were merely occasional and accidental effect of statute were insufficient to overcome clear commerce clause violation).